2000-NMCA-027

998 P.2d 1212

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Allan Ray RACKLEY, Defendant–
Appellant.**

No. 20,011.

Court of Appeals of New Mexico.

Feb. 11, 2000.

Certiorari Denied, No. 26,223,
March 31, 2000.

Patricia A. Madrid, Attorney General, M. Anne Kelly, Assistant Attorney General, Santa Fe, for Appellee.

Phyllis H. Subin, Chief Public Defender, Susan Roth, Assistant Appellate Defender, Santa Fe, for Appellant.

## OPINION

ALARID, Judge.

{1} Defendant appeals from his convictions for attempt to commit a felony (armed robbery), aggravated battery with a deadly weapon (firearm enhancement), aggravated assault with a deadly weapon (firearm en-

hancement), felon in possession of a firearm, and tampering with evidence. For the reasons set forth below, we reject Defendant's contentions and affirm the judgment of the trial court.

*SIXTH–MONTH RULE*

▮ {2} Defendant argues that he was entitled to dismissal of the charges against him because the State did not commence trial within the time limits prescribed by Rule 5–604(B) NMRA 2000. Neither party disputes that a petit jury was selected on September 2, 1998; that the six-month period of Rule 5–604(B) expired on September 6, 1998; and that the petit jury was not sworn and the State did not begin presentation of its case until September 24, 1998. Defendant argues that the selection of a jury did not constitute the "commencement" of his trial for purposes of Rule 5–604(B). Defendant argues that we should adopt a rule whereby a trial is not commenced for purposes of Rule 5–604(B) unless the proceeding has reached the point at which jeopardy attaches. According to Defendant, jeopardy did not attach until September 24, 1998—well after the expiration of the six-month period—when the jury was impaneled *and sworn.*

{3} The State responds that double jeopardy principles should not determine when a trial is commenced for purposes of Rule 5–604(B). Instead, according to the State, we should hold that Defendant's trial commenced on September 2, 1998, when voir dire began.

{4} We agree with the State. While we have no New Mexico case law directly on point, we note that Rule 5–607 NMRA 2000, "Order of trial," designates the selection and swearing of a jury as the first stage of a trial. Here, this process was begun within the prescribed period. We have previously recognized that Rule 5–604(B) requires that the defendant's trial *commence* within the prescribed period; it does not require that the trial be *completed* within that period. *See State v. Higgins,* 107 N.M. 617, 622, 762 P.2d 904, 909 (Ct.App.1988). We note parenthetically that decisions from other jurisdictions overwhelmingly, if not uniformly, recognize that a trial has commenced for purposes of speedy trial rules or statutes once jury selec-

tion has begun. *See, e.g., State v. Becerra,* 66 Wash.App. 202, 831 P.2d 781, 783 (1992) (construing state rule of criminal procedure); *United States v. Gonzalez,* 671 F.2d 441, 443–44 (11th Cir.1982) (construing federal Speedy Trial Act). Indeed, Defendant has not cited, and we have not found, a single case holding otherwise.

{5} Defendant further argues that even if a trial normally would be deemed to have commenced upon the initiation of the jury selection process, the procedure followed in the present case does not satisfy Rule 5–604(B). Defendant points out that although the jury was selected on September 2, 1998— within the time limits of Rule 5–604(B)—the trial was continued until September 24, 1998, with the result that the jury was not sworn, and the State did not begin the presentation of its case, until eighteen days after the six-month period of Rule 5–604(B) had expired. The State responds with two arguments. First, the State argues that the delay between the selection of the jury and the remainder of Defendant's trial—three weeks— did not amount to "undue delay." Second, the State argues that Defendant was aware from the trial court's remarks at an August 18, 1998, docket call that the court intended to bifurcate his trial to accommodate the schedule of a prosecution witness. The State points out that it was not until September 24, 1998 that Defendant raised the issue of compliance with Rule 5–604(B) by arguing that the case should be dismissed for failure to comply with the six-month deadline. The State, citing *State v. Arellano,* 1998–NMSC–026, ¶ 18, 125 N.M. 709, 965 P.2d 293, characterizes Defendant's conduct as impermissible "gamesmanship" that should be deemed a waiver of any Rule 5–604(B) claim.

▮ {6} Again, there is no New Mexico case directly on point and, once again, Defendant has not cited a single case supporting his position. However, as we have noted above, the literal language of Rule 5–604(B) merely requires that a defendant's trial be commenced within the six-month period—a circumstance that occurred in the present case. There is no requirement in the rule that all subsequent stages of the trial must be contiguous as Defendant argues, and we

will not read such a requirement into the rule. Our review of the case law from other jurisdictions indicates that a majority of courts considering this issue likewise have rejected the argument that voir dire and the remainder of the trial must be contiguous in order to satisfy speedy trial rules or statutes. Because we hold that the bifurcation of jury selection and the remainder of Defendant's trial was not inconsistent with Rule 5–604(B), we need not address the State's alternate argument that Defendant engaged in impermissible gamesmanship in not objecting to the bifurcation prior to September 24, 1998.

{7} We emphasize that our holding is limited to the facts of this case. Prolonged, unjustified delay or conduct suggestive of an attempt to circumvent Rule 5–604(B) will be closely scrutinized by this Court. *Cf. United States v. Stayton,* 791 F.2d 17, 20, 21 (2d. Cir.1986) (holding twenty-three month delay between voir dire and remainder of trial impermissible under Speedy Trial Act).

## JUROR BIAS

{8} Defendant argues that three jurors, Jurors 9, 13, and 22, should have been excused for cause. Defendant argues that due to the trial court's refusal to excuse Jurors 9 and 13 for cause, he was forced to exercise two peremptory challenges to remove them. Defendant argues that had he not been forced to exhaust his peremptory challenges to remove Jurors 9 and 13, he would have been able to exercise a peremptory challenge to remove Juror 22 when the trial court refused to excuse her for cause.

{9} Whether a prospective juror must be excused for cause is a decision committed to the discretion of the trial court. *See State v. Baca,* 111 N.M. 270, 274, 804 P.2d 1089, 1093 (Ct.App.1990). The jury selection process, including the excusal of jurors for cause, insures that a defendant is tried before an impartial jury. *See Fuson v. State,* 105 N.M. 632, 633, 735 P.2d 1138, 1139 (1987). Applying these principles, we find no error under the facts of this case.

{10} During voir dire, defense counsel inquired into the jurors' attitudes about the constitutional right to remain silent. Ju-

ror 9 stated that he resented Defendant's relying on a lawyer to speak for him. Later, Juror 9 pointed out the distinction between a defendant "having" to speak and "wanting" to speak. In response to further questioning by defense counsel, Juror 9 stated that "I don't think he should *have* to speak; he has the right to speak under the Constitution—if he desires." Defense counsel asked Juror 13 if she needed to hear from Defendant. Juror 13 responded that she would like to know where Defendant was at the time of the crime. In response to further inquiry by defense counsel, Juror 13 stated that if the State failed to prove guilt beyond a reasonable doubt, she would vote not guilty, and that she would not be bothered by Defendant's failure to take the stand in his defense.

{11} Defendant's objection to these two jurors appears to be based on the erroneous assumption that a juror is biased simply because the juror has a natural expectation that he or she will hear a defendant's version of events directly from the defendant. In determining whether these jurors were unable to function impartially, we focus on the presence or absence of evidence demonstrating that they were unwilling or unable to decide the case based on the evidence adduced at trial and the instructions given by the trial court, including any requested instructions explaining that a defendant's refusal to testify has no effect on the presumption of innocence. *See* UJI 14–5031 NMRA 2000. As the party claiming juror bias, Defendant had the burden of proving it. *Baca,* 111 N.M. at 274, 804 P.2d at 1093. We conclude that taken in context, the statements of Jurors 9 and 13 merely reflected a layperson's natural desire to hear Defendant's version of events in his own words; these statements did not indicate that Jurors 9 and 13 were unable or unwilling to decide Defendant's case on the facts established at trial and the trial court's instructions on the law. The trial court did not abuse its discretion in refusing to excuse these jurors for cause.

{12} Defendant argues that Juror 22 should have been stricken for cause because she expressed concern about Defen-

dant's status as a convicted felon. Again, we believe that Defendant is trying to convert a juror's admission of a layperson's natural response into prima facie evidence of impermissible bias. Evidentiary rules restricting the use of propensity evidence reflect a judgment that the probative value of such evidence is outweighed by unfair prejudice, confusion and waste of time. Christopher B. Mueller & Laird C. Kirkpatrick, *Modern Evidence–Doctrine and Practice* § 4.11 (1995). Although these rules and the policies they represent may be known to and accepted by lawyers, they are not necessarily familiar to non-lawyers, who routinely rely on information about a person's past behavior in making social and business judgments. *Id.* The fact that a juror is unaware at the outset of a criminal trial of the complicated scheme regulating the use of collateral offenses/character evidence, *see* Rules 11–404, 11–608 and 11–609 NMRA 2000, is not at all surprising and should not, of itself, give rise to a presumption that a juror is incapable of following the trial court's instructions on the proper uses of evidence of collateral offenses. Indeed, the very purpose of instructions is to educate jurors about the applicable law. *See, e.g.,* Rule 11–105 NMRA 2000; UJI 14–5028 NMRA 2000. We note that this juror stated in response to further questioning that she "would really try to—to just look at the evidence in this case because I think people change ." When Juror 22's remarks are considered in context, it is clear that Defendant failed to demonstrate that Juror 22 was biased or otherwise incapable of deciding this case on the facts established at trial and the trial court's instructions on the law. The trial court did not abuse its discretion in refusing to strike her for cause.

{13} Because we conclude that the trial court did not commit error in refusing to strike Jurors 9, 13, and 22, we need not address Defendant's argument that the trial court's refusal to strike these jurors interfered with Defendant's exercise of his peremptory challenges.

## ADMISSION OF MUGSHOTS

{14} Over Defendant's objection, three photographs of Defendant—State's exhibits 37 and 38—were admitted into evidence. These photographs are included in the record on appeal. Exhibit 37 appears to be a set of classic booking photographs, or "mugshots." Exhibit 38 shows Defendant in what appears to be a standard-issue prison jumpsuit. In Exhibit 37, Defendant's distinctive hairstyle, including a ponytail, clearly is visible. Exhibit 38 shows closely-cropped hair on the right side of Defendant's head.

{15} Although all three Arby's employees who were present during the holdup agreed that the robber was dressed in black and was wearing a baseball cap, none of them were able to identify Defendant as the robber dressed in black. It therefore was critical to the State's case to link Defendant to the holdup through circumstantial evidence. This evidence included crucial testimony of a witness employed near the Arby's restaurant who saw a man dressed in black clothes remove a baseball cap, revealing brown hair that was shaved at the sides and gathered in a ponytail.

{16} We review the trial court's admission of evidence under an abuse of discretion standard to determine whether the probative value of the evidence was outweighed by any prejudicial effect. *State v. McDonald,* 1998–NMSC–34, ¶ 14, 126 N.M. 44, 966 P.2d 752. Here, Exhibits 37 and 38 provided critical circumstantial evidence linking Defendant to the holdup by showing that Defendant's appearance was consistent with the appearance of the unidentified person seen running near the scene of the crime. We are not persuaded by Defendant's argument that there was no need to introduce the photographs in view of testimony by investigating officers that Defendant had a ponytail on the day of the holdup. The photographs allowed the jury to see for themselves how distinctive Defendant's hairstyle was at the time of the crimes and the extent to which Defendant had altered his appearance prior to trial.

{17} The present case is distinguishable from *State v. Gutierrez,* 93 N.M. 232, 599 P.2d 385 (Ct.App.1979), a principal case cited by Defendant. Here, unlike *Gutierrez,* no eyewitness was able to directly identify the defendant as the holdup man. Thus, in the present case the State's need for the intro-

duction of the photographs was substantially greater than in *Gutierrez*.

{18} We note that more typically, in cases involving the admission of mugshots, the prejudice to the defense arises from the fact that the jury unnecessarily learns that the defendant has a criminal record. *See, e.g., United States v. Harrington*, 490 F.2d 487, 490 (2d Cir.1973). Here, Defendant was charged, and ultimately convicted of, the crime of being a felon in possession of a firearm. As an element of this crime, the State was required to prove that Defendant was previously convicted of a felony within 10 years of the current offenses. As shown by the Judgment and Sentence in this case, Defendant had two previous felony convictions—larceny and aggravated battery.

{19} In an apparent effort to reduce the potential prejudicial impact of evidence revealing the nature of his prior felonies, Defendant stipulated to the fact of a prior, unidentified felony conviction. Thus, entirely apart from Exhibits 37 and 38, the jury would have been aware that Defendant was a convicted felon, and could reasonably have surmised, based on Defendant's stipulation to a prior felony, that Defendant had been arrested and booked on at least two occasions: (1) the arrest for the predicate offense underlying the felon-in-possession charge, and (2) the arrest on the charges in the current case.

{20} Under the facts of this case, Defendant has not demonstrated that the trial court's weighing of the probative value of the mugshots against any prejudice to Defendant amounted to an abuse of discretion.

{21} We likewise reject Defendant's desultory arguments based upon portions of the testimony of Detective Johnson and Officer Solano. Detective Johnson's testimony that he had had a conversation with Defendant approximately two weeks before the holdup of the Arby's enhanced his testimony about Defendant's appearance by showing that Johnson knew Defendant and that Johnson had observed Defendant's hairstyle on more than a single occasion. The identity of the holdup man was at issue and, as previously noted, Defendant's distinctive hairstyle was a crucial link in the circumstantial evidence establishing that Defendant and the holdup man were the same person. Officer Solano's testimony established that Defendant could not have stolen the firearm on which the State based the receiving stolen property count and enabled the State to prove that the property had been stolen by another, an essential element of the crime. *See* UJI 14–1650 NMRA 2000. Defendant has not suggested any other method by which the State could have established this element of the offense of receiving stolen property.

{22} In contrast to the State's clear need for this testimony, any prejudice to Defendant appears largely speculative. Even if the jury believed that detective Johnson had been investigating another, unspecified crime when he spoke to Defendant and his girlfriend, any unfavorable inferences about Defendant's character for criminal activity drawn by the jury from that fact would have been relatively weak. Even if Officer Solano's testimony suggested to the jury that Defendant had been incarcerated in October 1997, when the gun used in the crimes had been stolen from its owner, the most likely inference drawn by the jury would have been that Defendant was incarcerated due to the prior felony to which Defendant had stipulated.

{23} Under the facts of this case, Defendant has not demonstrated that the trial court's weighing of the probative value of this testimony against any prejudice to Defendant amounted to an abuse of discretion.

*DOUBLE JEOPARDY*

{24} Defendant argues that the firearm enhancements of his convictions for aggravated assault with a deadly weapon and aggravated battery with a deadly weapon violate double jeopardy. Defendant recognizes that this issue has been resolved against his position by prior decisions. *See, e.g., State v. Gabaldon*, 92 N.M. 230, 235, 585 P.2d 1352, 1357 (Ct.App.1978) and *State v. Charlton*, 115 N.M. 35, 38–41, 846 P.2d 341, 344–47 (Ct.App.1992). Defendant argues that the Supreme Court's decision in *State v. Contreras*, 120 N.M. 486, 903 P.2d 228 (1995)

has called into question the continuing validity of these prior cases. We disagree.

{25} We read *Contreras*, a felony-murder case, as a limited departure from traditional double jeopardy analysis "designed to cope more effectively with the complicated problem of compound and predicate offenses." *Swafford v. State*, 112 N.M. 3, 8 n. 4, 810 P.2d 1223, 1228 n. 4 (1991) (discussing *Whalen v. United States*, 445 U.S. 684, 100 S.Ct. 1432, 63 L.Ed.2d 715 (1980)). We do not read *Contreras* as generally modifying the double jeopardy analysis adopted by the Supreme Court in *Swafford* and applied by this Court in *Charlton*. We therefore apply our prior decision in *Charlton* and reject Defendant's double jeopardy claim.

## CONCLUSION

{26} For the reasons set forth above, we affirm the Judgment below.

{27} **IT IS SO ORDERED.**

APODACA and BOSSON, JJ., concur.