2003-NMCA-107

76 P.3d 47

**STATE of New Mexico, Plaintiff–Appellee,**

v.

**James GARDNER, Defendant–Appellant.**

**No. 22,321.**

Court of Appeals of New Mexico.

June 19, 2003.

Certiorari denied, No. 28,158, Aug. 14, 2003.

Patricia A. Madrid, Attorney General, Max Shepherd, Assistant Attorney General, Albuquerque, NM, for Appellee.

James W. Klipstine, Jr., James W. Klipstine, Jr., L.L.C., Hobbs, NM, for Appellant.

*OPINION*

FRY, Judge.

{1} Defendant James Gardner appeals his conviction, after a jury trial, of four counts of criminal sexual contact of a minor (CSCM) in the third degree. *See* NMSA 1978, § 30–9–13 (2001). His challenge to the trial court's judgment and sentence raises five issues: (1) whether the trial court should have granted a mistrial based on an alleged comment by a member of the venire, (2) whether the State's questioning in voir dire denied Defendant a fair and impartial jury, (3) whether the trial court properly instructed the jury on the elements of CSCM, (4) whether substantial evidence supported Defendant's convictions, and (5) whether the sentencing proceedings violated Defendant's due process rights. For the following reasons, we affirm.

**BACKGROUND**

{2} At the time of the alleged incidents, Defendant worked as an assistant principal in Hobbs, New Mexico. He had regular contact with students, and he often hugged them. Five female students claimed that Defendant had touched their breasts while hugging them. Specifically, they reported that Defendant had hugged them from the side, while standing next to them, and that when doing so he put his arm around their backs and under their arms so that his hand rested on or cupped their breasts. A sixth female student claimed that Defendant had touched her buttocks while she stood on a chair working on a bulletin board. Following an investigation into these allegations, the State charged Defendant with six counts of CSCM. A jury convicted Defendant of four counts and found him not guilty of two counts. The trial court sentenced Defendant to three years on each of the four counts, to run concurrently, followed by two years on parole.

**DISCUSSION**

**I. Denial of Defendant's Motions for Mistrial**

{3} Defendant contends that bias exhibited by Juror 18, who was excused from jury service and replaced with an alternate during the trial, tainted the entire jury. According to Defendant, therefore, the trial court erred in denying his motions for a mistrial. The State counters that, even if Juror 18 displayed bias, there is no evidence that her bias had any prejudicial effect on other jurors. In addition, the State contends that if there had been prejudice, the appropriate remedy was for Defendant to request a curative voir dire or an admonition to disregard. "We review a trial court's denial of a motion for mistrial under an abuse of discretion standard." *State v. Gonzales*, 2000–NMSC–028, ¶ 35, 129 N.M. 556, 11 P.3d 131.

{4} The alleged biased statement or statements by Juror 18 occurred during voir dire. Defendant's arguments on this issue require some context about the particular voir dire process employed by the trial court. On Defendant's motions, the trial court allowed supplemental jury questionnaires and individualized voir dire. During the individualized voir dire, the majority of the potential jurors remained seated in the courtroom. The trial judge and counsel for both parties then adjourned to the judge's chambers. The bailiff facilitated the selection process by seating groups of four to five potential jurors on a bench in the hallway outside the judge's chambers. Each juror was individually interviewed in chambers. Afterwards, on the return trip to the courtroom, each juror went back through the hallway, passing the subgroup of jurors waiting for their individual

interviews. As a potential juror went into chambers for voir dire, a new potential juror from the courtroom was added to the group in the hallway. In this manner, voir dire took place for about a day and a half. The trial began in the afternoon after the completion of jury selection. During the first afternoon of trial, the State gave its opening statement and presented the testimony of five witnesses.

{5} The following morning, prior to resuming in-court proceedings, the trial judge called the case in chambers before counsel only. The judge informed counsel that Juror 22, who had not been selected for the jury, had approached him outside of the courtroom regarding a comment made by Juror 18, who had been selected to serve. The trial judge investigated the matter further by calling in Juror 22 and questioning her under oath. Juror 22 testified that when Juror 18 walked through the hallway after being questioned in chambers, she said "He's guilty, oh, but not really," or something similar, and also made a motion like cutting her throat. Juror 22 further testified that she did not think much of the statement at the time, but that when she subsequently heard that Juror 18 had been selected, she thought it was important to convey the overheard comment to the trial court. Regarding the other jurors who also might have overheard the comment, Juror 22 stated that in the hallway with her were a man who feeds cows, a girl named Linda (probably Juror 15), and a juror she identified by name (Juror 19).

{6} After the trial judge excused Juror 22, the State suggested calling in Juror 18 for questioning, while Defendant moved for a mistrial on the basis that there was too much risk of a tainted jury. The trial court took the motion under advisement and then proceeded with in-chambers questioning of Juror 18, who denied making the comment in the hallway. However, she admitted making a "teasing" comment in the courtroom along the lines of "I should just tell them just to hang him high." She implied that this comment was in the context of joking about intentionally trying to be disqualified. Defendant renewed his motion for a mistrial, arguing that the interview revealed an addi-

tional prejudicial comment. The trial court excused Juror 18 from service, but declined to grant a mistrial, noting the lack of evidence of bias on the part of the remaining jurors.

{7} The trial court did, however, ask both parties whether they wanted the court to communicate with the jury, in the courtroom, regarding the excusal of Juror 18. Neither side wanted the trial court to mention the excusal. Defendant specifically stated that, although he did not wish to "waive any objection," talking to the jury "could make things worse." Thus Defendant made an express strategic decision to forego any further explanation to the jury.

{8} The parties subsequently called in the bailiff to supplement the record regarding which jurors were in the hallway when Juror 18 left her individual voir dire interview. His testimony was inconclusive and there is ultimately no certainty about which jurors were actually in the hallway and possibly overheard Juror 18's remark. Moreover, based on the in-chambers testimony of Juror 18 herself, the possibility remains that she made the "hang him high" comment while in the courtroom. Although Defendant's brief does not particularly focus on this comment, we consider the possibility that the courtroom comment forms the basis for Defendant's argument on appeal.

{9} In conducting its inquiry into possible bias, the trial court heard and assessed the testimony about both the courtroom and the hallway comments. In addition, the trial court heard testimony from Juror 18 that she harbored no bias toward Defendant. The trial court dismissed her nonetheless. The trial court then determined that, whatever might have been said, there was no evidence that comments by Juror 18 had prejudiced the remaining jurors. We conclude that the trial court did not abuse its discretion.

{10} As Defendant points out, a lone biased juror undermines the impartiality of an entire jury. *State v. McFall*, 67 N.M. 260, 263, 354 P.2d 547, 549 (1960). Defendant fails to persuade us, however, that the trial court erred in finding a lack of bias on his jury. Defendant's speculative argument primarily relies on cases in which extraneous

information reached the jury, which creates a presumption of prejudice. *State v. Sacoman,* 107 N.M. 588, 591, 762 P.2d 250, 253 (1988) (stating that extraneous information improperly considered during deliberations creates a presumption of prejudice) (disapproved of on other grounds by *State v. Mann,* 2002–NMSC–001, ¶ 24, 131 N.M. 459, 39 P.3d 124); *State v. Pettigrew,* 116 N.M. 135, 140, 860 P.2d 777, 782 (Ct.App.1993) (recognizing that presumption of prejudice was triggered by juror's unauthorized contact with intern); *State v. Perea,* 95 N.M. 777, 778–79, 626 P.2d 851, 852–53 (Ct.App.1981) (finding irreparable jury contamination where juror brought into jury room prejudicial newspaper article about the defendant's guilt, bailiff discussed article with jury, and juror then wrote note asking court not to grant mistrial based on newspaper incident). In contrast to the cases cited by Defendant, however, here there are no allegations that the jury was subjected to "outside mischiefs." *Cf. id.* at 778, 626 P.2d at 852. *See also Mann,* 2002–NMSC–001, ¶¶ 20–25, 131 N.M. 459, 39 P.3d 124 (explaining distinctions between jury tampering, jury misconduct, and jury bias); *Goodloe v. Bookout,* 1999–NMCA–061, ¶ 22, 127 N.M. 327, 980 P.2d 652 (recognizing the distinction between inappropriate communications within jury and influences from outside the jury, which are more serious).

{11} We also decline to adopt the reasoning suggested by the State, which relies on inapplicable cases in which jurors or witnesses made potentially prejudicial comments in open court. *See, e.g., State v. Barragan,* 2001–NMCA–086, ¶ 35, 131 N.M. 281, 34 P.3d 1157 (finding no abuse of discretion where trial court refused to grant mistrial because of unexpected and unsolicited witness testimony); *State v. Price,* 104 N.M. 703, 707–08, 726 P.2d 857, 861–62 (Ct.App. 1986) (affirming trial court's refusal to grant mistrial because of improper outburst by juror); *State v. Sanders,* 92 Ohio St.3d 245, 750 N.E.2d 90, 103–04 (2001) (examining the effects of a potential juror's statement that the defendant resembled Louis Farrakhan where statement occurred during voir dire in open court). Here the alleged comments were not made in open court where they could have been remedied in front of the entire jury

with an objection by defense counsel and an admonition to disregard by the trial court judge.

■ {12} Defendant alleges juror bias, which is distinct from jury tampering or jury misconduct. *Mann,* 2002–NMSC–001, ¶ 20, 131 N.M. 459, 39 P.3d 124. His claim has merit if the alleged comments by Juror 18 "unfairly affected the jury's deliberative process and resulted in an unfair jury." *Id.* Assuming, as Defendant argues, that the comments by Juror 18 reflected bias on her part, her personal bias did not infect deliberations because the trial court excused her from service and replaced her with an alternate, which is the appropriate remedy when a juror exhibits apparent bias. *State v. Hovey,* 106 N.M. 300, 304, 742 P.2d 512, 516 (1987). Thus we are left with the possibility that a potential juror or jurors, either in the hallway or in the courtroom, heard a comment by Juror 18 in which she expressed an opinion that Defendant was guilty. If this happened, it occurred prior to the jury's oath to arrive at a verdict according to the evidence and the law contained in the instructions of the court, and prior to the presentation of evidence. Consequently, to find actual bias among the jurors, we must further speculate that a juror who overheard a comment was actually selected for jury service and then, in the course of service, disregarded the trial court's instructions. *See State v. Case,* 100 N.M. 714, 720, 676 P.2d 241, 247 (1984) (relying on "presumption that the jury obeyed its instructions"). Only this attenuated and unproven chain of events could have resulted in the bias alleged by Defendant. Consequently, we find no abuse of discretion in the trial court's finding a lack of evidence that other jurors were affected by a comment or comments by Juror 18. *See State v. Rackley,* 2000–NMCA–027, ¶ 11, 128 N.M. 761, 998 P.2d 1212 (explaining that inquiry into potential jury bias focuses on "presence or absence of evidence demonstrating that [jury was] unwilling or unable to decide the case based on the evidence"). Given the speculative nature of the alleged bias, the trial court's finding was not "against the logic and effect of the facts and circumstances before the court," *Pettigrew,*

116 N.M. at 140, 860 P.2d at 782 (Ct.App. 1993) (internal quotation marks and citation omitted), and the trial court did not abuse its discretion.

{13} Moreover, if Defendant disagreed with the results of the trial court's inquiry, Defendant could have proceeded with additional voir dire of the remaining jurors, an appropriate next step if further investigation was needed. *See Goodloe*, 1999–NMCA–061, ¶ 23, 127 N.M. 327, 980 P.2d 652 (stating that where court learns of premature jury deliberations, "it should conduct an inquiry to determine whether the fairness of the trial has been threatened and then take appropriate measures"). Defendant rejected the trial court's offer to conduct additional voir dire. Because he declined the additional remedy offered at trial, he cannot now obtain relief in the form of a new trial. *See State v. Sanchez*, 120 N.M. 247, 251, 901 P.2d 178, 182 (1995) ("[B]y failing to question the juror during voir dire, Appellants waived any objection to the juror's participation in the trial.").

## II. The Trial Court's Excusal of Jurors for Cause

{14} Defendant alleges error in the trial court's granting of the State's challenges for cause. Defendant contends the trial court excused at least seven jurors because of their answers to particular questions and that as a result, he was deprived of a fair and impartial jury.

{15} During individualized voir dire, the State asked the jurors whether, in assessing witness credibility, they would believe an adult over a teenager; whether they would require physical evidence to convict a defendant of criminal sexual activity; whether they would require more than just testimony to convict; and whether they would need more than the uncorroborated testimony of the victim to convict. Defendant contends that an affirmative answer to any of these questions resulted in excusal for cause on the State's motion, regardless of the jurors' statements that they would follow court instructions and be fair. In Defendant's view, this amounted to "pre-qualifying a jury to decide the case on the very selective scenario proposed by the State."

{16} We review rulings on challenges for cause under an abuse of discretion standard. *State v. Baca*, 111 N.M. 270, 274, 804 P.2d 1089, 1093 (Ct.App.1990). The trial court properly excludes a juror for cause where the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *State v. Sutphin*, 107 N.M. 126, 129, 753 P.2d 1314, 1317 (1988) (internal quotation marks and citation omitted). We commit this inquiry to the discretion of the trial court because the trial judge can best assess a potential juror's state of mind. *Id.* In this case, Defendant does not argue that the trial court failed to excuse jurors for cause, but raises the somewhat different question of whether certain jurors should not have been excused. *See, e.g., State v. Jim*, 107 N.M. 779, 782–83, 765 P.2d 195, 198–99 (Ct.App.1988) (holding that trial court did not abuse its discretion in excusing a juror for cause). Thus, the larger question he raises is whether the remaining jurors were competent and unbiased in accordance with his right to an impartial jury. *See McFall*, 67 N.M. at 263, 354 P.2d at 548–49 (explaining that an accused is guaranteed trial by a jury composed of members who are "totally free from any partiality whatsoever"). Defendant cannot prevail on appeal unless he demonstrates that the jurors finally selected were biased or prejudiced. *See State v. Smith*, 76 N.M. 477, 479, 416 P.2d 146, 148 (1966).

{17} Assuming that the trial court excused the jurors based solely on their affirmative answers to these questions, we do not believe the trial court's decisions were "clearly untenable or not justified by reason." *See State v. Rojo*, 1999–NMSC–001, ¶ 41, 126 N.M. 438, 971 P.2d 829 (internal quotation marks and citations omitted). As for the overarching question of whether the trial court ensured Defendant an impartial jury, Defendant fails to establish prejudice. He does not direct us to anything in the record suggesting that the jurors ultimately impaneled were biased or motivated by partiality. "Defendant has a legal right only to impartial

jurors, not to the impartial jurors of his choice." *Jim,* 107 N.M. at 783, 765 P.2d at 199. Accordingly, we find no abuse of discretion in the trial court's excusal of certain jurors for cause.

### III. Jury Instructions on the Elements of Criminal Sexual Contact of a Minor

{18} To instruct the jury on the elements of CSCM, the trial court utilized instructions that were consistent with both the uniform jury instructions and case law. UJI 14–926 NMRA 2003; *State v. Osborne* 111 N.M. 654, 658, 808 P.2d 624, 628 (1991). Defendant argues, however, that the instructions did not contain the correct legal standard with respect to the statutory elements of coercion and unlawfulness, for which he tendered additional jury instructions that the trial court rejected. In addition, Defendant objects to the wide periods of time covered by several of the counts, claiming that the instructions permitted the jury to find him guilty of a course of conduct rather than specific criminal acts.

{19} "The propriety of jury instructions given or denied is a mixed question of law and fact. Mixed questions of law and fact are reviewed de novo." *State v. Salazar,* 1997–NMSC–044, ¶ 49, 123 N.M. 778, 945 P.2d 996. For the reasons that follow, we find that the trial court correctly instructed the jury on the essential elements of the crime, and that the instructions were not confusing to a reasonable juror. *See State v. Benally,* 2001–NMSC–033, ¶ 12, 131 N.M. 258, 34 P.3d 1134 (explaining that jury instructions are reviewed to determine "whether a reasonable juror would have been confused or misdirected") (internal quotation marks and citations omitted). Additionally, we find that the time periods used in the jury instructions did not violate Defendant's rights under the multi-factor test set out in *State v. Baldonado,* 1998–NMCA–040, ¶¶ 26–28, 124 N.M. 745, 955 P.2d 214.

{20} The trial court convicted Defendant of four counts of CSCM under Section 30–9–13, the relevant sections of which follow:

A. Criminal sexual contact of a minor in the third degree consists of all criminal sexual contact of a minor perpetrated:

. . .

(2) on a child thirteen to eighteen years of age when:

(a) the perpetrator is in a position of authority over the child and uses this authority to coerce the child to submit; . . .

To instruct the jury on the elements of this crime, the trial court relied on UJI 14–926:

For you to find the defendant guilty of criminal sexual contact of a minor by use of coercion by a person in a position of authority as charged in Count [number], the state must prove to your satisfaction beyond a reasonable doubt each of the following elements of the crime:

1. The defendant touched or applied force to the breasts [or buttocks] of [victim];

2. The defendant was a person who by reason of his relationship to [victim] was able to exercise undue influence over [victim] and used this authority to coerce her to submit to sexual contact;

3. [victim] was at least 13 but less than 18 years old;

4. This happened in New Mexico on or about the [date] day of [date].

{21} On the issue of coercion, defined in item 2 of the instruction, Defendant tendered additional jury instructions that the trial court rejected. Specifically, Defendant requested an instruction that "[t]he fact the Defendant was in a position of authority does not alone establish that he used that authority to coerce sexual contact." On appeal, he contends that the statute requires that a defendant "must occupy a position which enables him to exercise undue influence *and* that influence must be used to compel the victim to submit." He claims that he did not coerce the contact because he never approached the victims or directed them to do anything. While he acknowledges that the evidence supports the inference that he "inappropriately touched the students when circumstances permitting it arose," he argues that the evidence "does not support the necessary element of use of authority to coerce."

{22} We are not persuaded. Coercion for the purposes of CSCM occurs when a defendant occupies "a position which

enables that person to exercise undue influence over the victim and that influence must be the means of compelling submission to the contact. . . . [S]uch coercion might take many forms but is less overtly threatening than physical force or threats." UJI 14–926, Comm. Commentary; *see also State v. Gillette*, 102 N.M. 695, 702, 699 P.2d 626, 633 (Ct.App.1985) ("Submission to the request of an authority figure is coerced if it is achieved through undue influence."); *cf.* NMSA 1978, § 30–9–10 (2001) (defining coercion in other statutory contexts). Undue influence results from "moral, social, or domestic force exerted upon a party, so as to control the free action of his [or her] will." *Gillette*, 102 N.M. at 702, 699 P.2d at 629 (internal quotation marks and citation omitted). The instruction given was in the conjunctive, requiring the jury to find that Defendant "was able to exercise undue influence over [each victim] *and* used this authority to coerce [the victim] to submit to sexual contact." (Emphasis added.) Accordingly, the instruction reflected the law regarding the coercion element of third-degree CSCM, while Defendant's tendered instruction did not.

{23} The trial court also gave the jury the following instruction defining the unlawfulness element of CSCM, as required by *Osborne*, 111 N.M. at 660–61, 808 P.2d at 630–31:

> In addition to the other elements of Criminal Sexual Contact of a Minor, the State must prove beyond a reasonable doubt that the behavior was unlawful. For the behavior to have been unlawful it must have been done in a manner calculated to arouse or gratify sexual desire, or otherwise to intrude upon the bodily integrity or personal safety of [the victim]. Criminal Sexual Contact of a Minor does not include a touching for purposes of [reasonable medical treatment or] nonabusive [parental or] custodial child care.

Defendant claims that, because he did not seek contact with the victims, there was no evidence that he "intrude[d] upon the bodily integrity or personal safety" of the victims; therefore, he contends that this alternative definition of unlawfulness should have been left out of the instruction. Thus, he argues

that the trial court should have instructed the jury that his behavior was unlawful only if the touching was for "personal gratification." He maintains that the instruction permitted the jury "to consider legal elements which were simply not at issue." Defendant further argues, as he did throughout the trial, that any actual, inappropriate contact with the victims was inadvertent and, therefore, without unlawful intent. According to Defendant, the unlawfulness instruction wrongly allowed the jury to assume that the State did not have to prove beyond a reasonable doubt that he touched the victims "deliberately and intentionally for some personal gratification."

{24} Again, we are not persuaded. A defendant who unlawfully and intentionally touches an intimate part of a minor's body is guilty of criminal sexual contact of a minor, regardless of whether the defendant was motivated by a desire to obtain sexual gratification or by some other desire. *State v. Pierce*, 110 N.M. 76, 83, 792 P.2d 408, 415 (1990). The statute protects the bodily integrity and personal safety of minors in relation to persons in positions of authority and trust. *Id.* at 80, 792 P.2d at 412. The evidence at trial, that Defendant touched the breasts and buttocks of the victims, reasonably gave rise to the inference that Defendant either sought sexual arousal or that he meant to violate the victims' bodily integrity.

{25} Furthermore, the trial court defined for the jury what the State had to prove in order to establish that Defendant acted intentionally:

> In addition to the other elements of Criminal Sexual Contact of a Minor, the State must prove to your satisfaction beyond a reasonable doubt that the defendant acted intentionally when he committed the crime. A person acts intentionally when he purposely does an act which the law declares to be a crime, even though he may not know that his act is unlawful. Whether the defendant acted intentionally may be inferred from all of the surrounding circumstances, such as the manner in which he acts, the means used, his conduct and any statements made by him.

UJI 14–141 NMRA 2003 (defining general intent). This jury instruction on intent, together with the other instructions given, correctly "require[d] the state to prove, as an essential element of the offense, that the touching was done intentionally." *Osborne,* 111 N.M. at 659, 808 P.2d at 628.

{26} In his final attack on the jury instructions, Defendant contends that the lengthy time periods in several of the instructions permitted the jury to convict him of a course of conduct rather than specific crimes. For example, with respect to one victim, the instruction stated that the contact had occurred "on or between the 1st day of October, 1997 and the 30th day of June 1999." Defendant's contention thus invokes the due process consideration that the accused is entitled to notice of specific crimes in order to prepare a defense. *Baldonado,* 1998–NMCA–040, ¶ 21, 124 N.M. 745, 955 P.2d 214. With respect to his defense preparations, Defendant asserts he was prejudiced "by being denied the ability to potentially bring in witnesses to support his position that the specific act did not meet the elements of the crime." Defendant further argues that the instructions allowed individual jurors to consider multiple offenses within one count, and that consequently "the jury was not required to be unanimously convinced beyond a reasonable doubt that [Defendant] committed a specific act." For the following reasons, we find no error with respect to the time periods used in the jury instructions.

{27} Whether a time frame used to charge and prosecute a defendant complies with the constitutional requirement of reasonable specificity depends on two factors: (1) whether the State could have been more specific, and (2) if so, whether the State's failure to be more specific prejudiced the defendant. *Id.* ¶ 29. The time frames at issue here ranged from one month to twenty-one months. We analyze whether the State could have been more specific by considering the factors in *Baldonado* in order to balance the needs of the State with the rights of Defendant. *Id.* ¶ 27.

{28} In this case, factors relevant to our analysis include the age and intelligence of the victims; whether the victims alleged a continuing course of conduct as opposed to isolated events; and the nature of the offenses, including whether they were likely to occur at a specific time. *Id.* The victims were minors at the time of the events, although, as Defendant states, they were high school students, not young children who may have difficulty particularizing dates and times. Thus, the age and intelligence of the victims is not a factor that particularly supports the State's use of lengthy charging periods. Of much greater significance to our analysis is that two of the convictions resulted from allegations that clearly described a continuing course of conduct under circumstances where Defendant, in his role as assistant principal, had frequent but unpredictable access to the students such that the alleged contact occurred continuously and randomly, not at specific times. Accordingly, we conclude that the instructions pertaining to these two victims each properly charged one count for a pattern of conduct. *See State v. Altgilbers,* 109 N.M. 453, 465, 786 P.2d 680, 692 (Ct.App.1989) (explaining that prosecution may reasonably charge one count for multiple acts). Not all of the allegations, however, qualify as continuing courses of conduct. Two of the victims each alleged a single incident of improper contact but apparently did not identify precise dates for the State. One of these incidents resulted in a one-month time frame, and the other resulted in a five-month window corresponding to the school semester in which the incident occurred. These shorter time frames used indicate that, where possible, the State worked with the victims in an attempt to pinpoint the time of the alleged abuse. *Cf. Baldonado,* 1998–NMCA–040, ¶ 31, 124 N.M. 745, 955 P.2d 214 (expressing concern with indications that prosecution did nothing to attempt to shorten the charging period where possible).

{29} More important, assuming for the purpose of argument that the State could have been more specific, we find no indication of prejudice to Defendant. Many of the alleged incidents of CSCM were hidden under the victim's arm. It is unlikely that there were witnesses to the contact. Many

of the events occurred when the victims were alone with Defendant, for example, in his office or in an unoccupied classroom. Additionally, Defendant does not deny that he touched the students, but instead claims that his contact did not amount to CSCM. Defendant's theory left the jury with the task of assessing the credibility of the victims and the credibility of Defendant, and then reaching a conclusion about the nature of the contact that occurred. In this context, it is unclear how testimony from the potential, unidentified witnesses would have affected the jury's assessment of Defendant's credibility and that of his victims. Defendant presents only speculative arguments about prejudice to his defense. In the absence of actual prejudice, we find no error in the time frames used by the State. *See State v. Ervin*, 2002–NMCA–012, ¶ 17, 131 N.M. 640, 41 P.3d 908 (stating that without actual prejudice to the defendant resulting from the prosecution's charging time frame, there is no reversible error).

{30} Finally, we address Defendant's related claim that the instructions permitted a non-unanimous verdict because the jurors did not all have to agree that he committed a single act to return guilty verdicts on the forms with the lengthy time spans. This argument pertains only to the verdicts with respect to victims J.H. and A.G. because the other two guilty verdicts, pertaining to victims D.G. and L.M., stemmed from allegations of a single incident of CSCM, and thus a non-unanimous verdict was not possible on those two counts. Defendant's argument is not persuasive because Defendant does not argue that contact with the students never occurred. Rather, Defendant argues that his contact with the victims was inadvertent, lawful, or not coerced. Under these circumstances, "with respect to a conviction on any count, there would have been no rational basis for some jurors to predicate guilt on one act while other jurors predicated guilt on a different act." *Altgilbers*, 109 N.M. at 469, 786 P.2d at 696. Moreover, Defendant points to nothing in the record suggesting that the verdicts were not unanimous. In the complete absence of such indications, we decline to speculate that the verdicts lacked unanimity. *See State v.*

*Dobbs*, 100 N.M. 60, 70–71, 665 P.2d 1151, 1161–62 (Ct.App.1983).

## IV. Substantial Evidence

{31} Defendant argues there was insufficient evidence that he used his position of authority to coerce the victims. According to Defendant, even viewing the evidence in the light most favorable to the verdict, the most that the evidence supports is that "he took advantage of an opportunity" and "he did not force the contact." Defendant emphasizes that, for the most part, the victims never alleged that he "sought them out" and never complained about his "method of hugging." Insofar as Defendant claims that coercion requires "affirmative forceful acts," this argument is quite similar to his erroneous contention, addressed above, that the jury instructions did not correctly reflect the coercion element of CSCM. The State responds that the element of coercion can be proven inferentially, and that here there was sufficient evidence for a reasonable mind to conclude that Defendant used his position of authority to coerce his victims.

{32} We review a claim of insufficient evidence to determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Garcia*, 114 N.M. 269, 274, 837 P.2d 862, 867 (1992) (citation omitted). In conducting this review, we resolve all conflicts and indulge all permissible inferences to uphold the conviction, and disregard all evidence and inferences to the contrary. *Rojo*, 1999–NMSC–001, ¶ 19, 126 N.M. 438, 971 P.2d 829. Applying this standard to the evidence supporting the coercion element of Defendant's CSCM convictions, we find no error.

{33} The testimony of the victims themselves provided the basis for all four convictions. The record reflects that all four victims provided testimony sufficient for a reasonable mind to conclude that the unlawful contact was at least in part a result of Defendant's position of authority. *See State v. Trevino*, 113 N.M. 804, 807, 833

P.2d 1170, 1173 (Ct.App.1991) (holding that sufficient connection between employment and sexual contact permitted jury to infer coercion by employer).

{34} Victim D.G. testified that, at her mother's suggestion, she went to discuss a school problem with Defendant. After they talked, he told her he would take care of the problem and then gave her a hug in such a way that he touched her breast.

{35} Victim L.M. testified that as she stood on a chair working on a bulletin board, Defendant approached her and they began a conversation. As she started to get down from the chair to continue talking with him, Defendant put his hand on her lower back, and then her hip, and then slid his hand down to her left buttock and kept his hand there as he talked with her until she moved away from him. L.M. further testified that as the conversation ended Defendant hugged her and intentionally dragged his hand across her buttocks. She stated that she did not tell anyone about the incident at the time because she thought that no one would believe her.

{36} Victim J.H. testified that Defendant repeatedly hugged her in a way that allowed him to touch the side of her breast. She did not tell anyone because everyone loved Defendant and she feared she would not be believed. She stated that she trusted Defendant as a friend and went to him for help with her problems, that he excused her absences, and that he wanted to help her stay in school. Because of his inappropriate touching of her body, she stopped trusting him.

{37} Victim A.G. testified that Defendant repeatedly slipped his hand under her arm and cupped her breast, almost touching her nipple. At first she did not tell anyone because she was not sure that Defendant's touching was intentional, but it happened so often that eventually she realized it must be intentional. A.G. stated that Defendant touched her breasts more times than she could remember. A.G. testified that she did not tell anyone because she knew it happened to others and they did not tell.

{38} This evidence supports the inference that Defendant used his position of authority to gain the trust of the victims, to obtain the opportunity to touch the victims, and to cause them to submit to his unlawful touching. Defendant argues that there was no coercion because "there is no indication the sexual contact was forced." However, in the context of CSCM, the law does not define coercion in the terms used by Defendant. The testimony permitted the jury to reasonably infer a connection between Defendant's position of authority and his sexual contact with the victims, which is sufficient to infer the existence of coercion. *See id.* at 807, 833 P.2d at 1173 (holding that circumstances evidencing a defendant's authority over a minor victim inferentially support a finding of coercion). Accordingly, substantial evidence supports the element of coercion as required to support Defendant's convictions.

## V. Defendant's Due Process Rights During Sentencing

{39} Defendant argues that the trial court violated his due process rights at the sentencing hearing in which it considered the existence of mitigating or aggravating circumstances. According to Defendant, the procedure exceeded the bounds of NMSA 1978, § 31–18–15.1 (1993), because some of the State's witnesses made allegations of previous improper sexual conduct by Defendant for which he was never charged or convicted. Defendant characterizes the events described by the witnesses as "unsubstantiated in any way." Although he concedes that the State did not seek an increase to the basic sentence for a third-degree felony, he urges nevertheless that the testimony at sentencing amounted to an attempt by the State to present aggravating circumstances without providing advance notice as required by due process. "We review the trial court's sentencing for an abuse of discretion." *State v. Jensen,* 1998–NMCA–034, ¶ 19, 124 N.M. 726, 955 P.2d 195.

{40} At sentencing, Defendant called four witnesses to testify on his behalf. On appeal, Defendant states that these witnesses "were subjected to cross examination by the State," although it appears the State chose not to

cross-examine any of the four witnesses. Defendant also made a brief personal statement on his own behalf. The State then presented testimony from seven witnesses. One of the witnesses, who was a victim of the crimes adjudicated at this trial, made a statement regarding the actions for which Defendant was convicted; three of the witnesses stated that in the past Defendant had victimized them, too, although Defendant was never convicted of the alleged actions; three of the witnesses were parents who stated that their daughters had been victimized by Defendant, although again, Defendant was not necessarily charged or convicted of the alleged improper conduct with their daughters. The record reflects, contrary to Defendant's contention, that the trial court placed the seven witnesses under oath prior to their testimony. Defendant correctly notes, however, that each of the seven witnesses made a statement, rather than testifying by way of direct examination, and also that subsequent to the statements defense counsel did not have the opportunity to cross-examine the witnesses.

{41} After the State's witnesses testified, the trial court made a brief statement indicating that it had considered all of the evidence presented at trial, as well as the mitigating circumstances presented by Defendant at sentencing, including his "prior service and reputation, [and] his activities in schools and churches." Then the trial court sentenced Defendant to the basic sentence of three years for a third-degree felony, see NMSA 1978, § 31–18–15(A)(5) (1999), with the sentences for the four counts to run concurrently followed by two years of parole.

{42} Defendant insists that this process was erroneous because he was entitled to advance notice that the State would seek "to present aggravating circumstances to convince the Court to imprison [Defendant]." We find this argument unpersuasive because there is nothing in the record suggesting that Defendant was prejudiced by the procedure employed. The trial court did not indicate that it considered the testimony given at the sentencing hearing by the State's witnesses in imposing sentence. In addition, the State sought the basic sentence and Defendant received the basic sentence. Regardless of what mitigating evidence Defendant presented, the statutory scheme does not require the trial court to depart from the basic sentence. *State v. Cumpton,* 2000–NMCA–033, ¶ 12, 129 N.M. 47, 1 P.3d 429. Moreover, because the trial court did not alter the basic sentence upward or downward as permitted by Section 31–18–15.1, there is no need to consider whether this case invokes the due process concerns addressed by the U.S. Supreme Court in *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and analyzed by this Court in *State v. Wilson,* 2001–NMCA–032, 130 N.M. 319, 24 P.3d 351.

{43} This is not to say that there could never be an outside limit on the trial court's broad statutory authority to consider at sentencing "whatever evidence or statements it deems will aid it in reaching a decision." § 31–18–15.1(A); *see also Wilson,* 2001–NMCA–032, ¶ 25, 130 N.M. 319, 24 P.3d 351 ("[O]ur case law allows the court discretion to consider almost any relevant factor or evidence in determining the appropriate sentence."). Where the trial court relies on certain information that, in turn, affects a defendant's sentence, then due process may require advance notice to the defendant so that the defendant has the opportunity to challenge the accuracy of the information. *See State v. Montoya,* 91 N.M. 425, 427, 575 P.2d 609, 611 (finding no error in the trial court's consideration of a presentence report that included arrests not resulting in convictions, but implying that error might exist if the trial court considered inaccurate information or information that the defendant had no opportunity to explain). *See also State v. Lack,* 98 N.M. 500, 507, 650 P.2d 22, 29 (Ct.App.1982) (holding that when trial court orders restitution at sentencing pursuant to statute, the defendant is entitled to notice of the amount claimed and the opportunity to dispute the amount). In this case, however, there is no indication that the trial court relied upon the testimony of the State's witnesses in deciding to impose the basic sen-

tence rather than, for example, suspending one-third of the basic sentence as permitted under Section 31–18–15.1(C). *Cf. Denson v. State of Nevada,* 112 Nev. 489, 915 P.2d 284, 287 (1996) (finding error where the trial judge's remarks at sentencing indicated an intent to punish for uncharged crimes). The trial court's statement at sentencing reflects that the sentence resulted from the evidence presented at trial. We cannot find an abuse of discretion in the imposition of a basic sentence that was grounded in the evidence.

**CONCLUSION**

{44} For the foregoing reasons, we affirm Defendant's convictions.

{45} **IT IS SO ORDERED.**

WE CONCUR: A. JOSEPH ALARID and MICHAEL D. BUSTAMANTE, Judges.