This memorandum opinion was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.                                                                          **No. 34,941**

**MICHELLE GARNER,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF OTERO COUNTY**
**Angie K. Schneider, District Judge**

Hector H. Balderas, Attorney General
Santa Fe, NM
Elizabeth Ashton, Assistant Attorney General
Albuquerque, NM

for Appellee

Bennett J. Baur, Chief Public Defender
Allison H. Jaramillo, Assistant Appellate Defender
Santa Fe, NM

for Appellant

**MEMORANDUM OPINION**

**SUTIN, Judge.**

**{1}** Defendant Michelle Garner appeals her convictions for battery on a peace officer and resisting, evading, or obstructing an officer. On appeal, she contends that her convictions violate double jeopardy principles and that fundamental error occurred when the district court considered facts that transpired in the course of a different case when sentencing Defendant. For the reasons that follow, we reverse with respect to the first issue and affirm as to the second issue.

**BACKGROUND**

**{2}** Defendant's convictions arose out of an incident that occurred at Defendant's daughter's home on June 27, 2013. Detective Eliza Fernandez of the Alamogordo Police Department was on patrol when she received an intake call from the Children, Youth, and Families Department (CYFD) to assist in an investigation. Due to her concerns about the investigation, Detective Fernandez called for a supervisor, and Sergeant Adam Prudencio responded to the scene. The State and defense stipulated at trial that the police were lawfully present at the home.

**{3}** As Sergeant Prudencio spoke with Defendant's daughter, Krystal Romero, Detective Fernandez was photographing the residence as part of the investigation. Detective Fernandez heard a female voice yell, "You're not going to take my grandchildren!" The voice belonged to Defendant. Detective Fernandez stopped what she was doing and went into the living room area, where Sergeant Prudencio was

speaking with Defendant and trying to calm her down. Defendant calmed down, took one of her grandchildren, and went outside to smoke a cigarette.

{4} At that point, Detective Fernandez stepped out of the home to call the on-call assistant district attorney to seek advice regarding the situation; a decision was made to remove the children from the home and obtain medical treatment. While Defendant was on the porch, Detective Fernandez re-entered the home and informed Ms. Romero, who was on a couch just inside the front door, of this decision. Upon hearing this, Ms. Romero screamed out, and Defendant ran inside.

{5} Detective Fernandez testified at trial that as Defendant was coming through the door, Sergeant Prudencio told her to "back off." Defendant pushed the sergeant and punched him in the chest with a closed fist. Sergeant Prudencio began trying to secure Defendant by performing a wrist lock; to do so, he went out the front door onto the porch, where there was a platform. Sergeant Prudencio was on the ground with Defendant, telling her to stop resisting, and Detective Fernandez got on the ground as well. When Detective Fernandez was asked, "How did they get on the ground[,]" she testified, "I don't know, it happened so quick." Detective Fernandez saw that the sergeant needed assistance, so she went to the ground, tried to grab Defendant's other arm, and told Defendant to stop resisting several times. Defendant was kicking quite a bit at that time, and both officers were on the ground, trying to secure Defendant.

3

She further testified that she saw Defendant strike Sergeant Prudencio in his upper leg and above his groin. Detective Fernandez testified that she was kicked by Defendant in her right knee and was kicked multiple times because Defendant was kicking back and forth. She described Defendant's kicks as "mule kicks," where Defendant's stomach was to the ground and Defendant was kicking her legs back. Detective Fernandez estimated that the entire event, from Defendant's initial striking of Sergeant Prudencio to Defendant's thrashing, took between one and a half to two minutes. Defendant ceased kicking once she was in handcuffs and up off of the ground.

{6}     Sergeant Prudencio also testified at trial. He stated that he reached Ms. Romero's home prior to Defendant and that when Defendant arrived, about ten minutes later, she was "angry" and was repeatedly yelling, "You're not taking my grandchildren." He told Defendant to calm down, and she took one of her grandchildren to the porch and began smoking a cigarette. Defendant was outside for no more than five minutes when she heard that the decision had been made to take custody of at least one of the children, and Defendant bolted through the front door. The sergeant testified that Defendant "came charging inside," he was standing about three feet in front of the door, and Defendant shoved him and tried to push past him. Sergeant Prudencio told Defendant to calm down and go back outside numerous times. Defendant kept trying to get around the sergeant by pushing and shoving him,

4

until he had to start pushing her outside. When Defendant got to the doorway opening, she kicked him in the groin and punched him in the chest. Sergeant Prudencio observed that Defendant was preparing to punch him again, so he grabbed her wrist so she could not hit him again. To accomplish the wrist lock, the sergeant grabbed Defendant's right wrist, turned it in a minor twist, which put pressure on Defendant to bring her to the floor. Defendant was trying to pull back away from him while he had her wrist, and Defendant continued kicking him in the knees, so he exerted more pressure on Defendant's wrist. Defendant went to her knees and was trying to bite him on his legs. Sergeant Prudencio grabbed Defendant from behind her head and pushed her head to the sidewalk. The sergeant held Defendant that way and instructed her to put her other arm behind her back. Throughout this time, Defendant was yelling out that Sergeant Prudencio was hurting her. Defendant did not become compliant until she was in handcuffs.

{7}     Based on the foregoing events, Defendant was charged with two counts of battery on a peace officer and resisting, evading, or obstructing an officer. At trial, defense counsel requested a jury instruction on self-defense as it pertained to the battery against Sergeant Prudencio, which was given. The jury convicted Defendant of one count of battery upon a peace officer against Detective Fernandez, one count

5

of battery upon a peace officer against Sergeant Prudencio, and one count of resisting, evading, or obstructing an officer, with respect to the sergeant. This appeal followed.

**DISCUSSION**

**Double Jeopardy**

**{8}** Defendant contends that her convictions for resisting, evading, or obstructing an officer and battery on a peace officer against Sergeant Prudencio violate double jeopardy.

**{9}** Double jeopardy presents a question of law that we review de novo. *State v. Bernal*, 2006-NMSC-050, ¶ 6, 140 N.M. 644, 146 P.3d 289. Because Defendant was charged with violation of multiple statutes, we are presented with a "double description" issue. *See State v. Ford*, 2007-NMCA-052, ¶ 8, 141 N.M. 512, 157 P.3d 77 (classifying a double jeopardy challenge to separate convictions for resisting, evading, or obstructing an officer and battery on a peace officer as a double description issue). For double description cases, we apply the two-part test set forth in *Swafford v. State*, 1991-NMSC-043, ¶¶ 9, 25, 112 N.M. 3, 810 P.2d 1223: (1) whether the conduct is unitary, and (2) if so, whether the Legislature intended to punish the offenses separately. *See State v. Silvas*, 2015-NMSC-006, ¶ 9, 343 P.3d 616. "Only if the first part of the test is answered in the affirmative, and the second

6

in the negative, will the double jeopardy clause prohibit multiple punishment in the same trial." *Id.* (internal quotation marks and citation omitted).

{10} When determining whether Defendant's conduct was unitary, we consider whether her actions were separated by sufficient indicia of distinctness. *See State v. DeGraff*, 2006-NMSC-011, ¶ 27, 139 N.M. 211, 131 P.3d 61. "Conduct is unitary when not sufficiently separated by time or place, and the object and result or quality and nature of the acts cannot be distinguished." *Silvas*, 2015-NMSC-006, ¶ 10. "[W]e consider such factors as whether the acts were close in time and space, their similarity, the sequence in which they occurred, whether other events intervened, and [the] defendant's goals for and mental state during each act." *Ford*, 2007-NMCA-052, ¶ 12.

{11} Applying the foregoing factors, we observe that the entire incident appears to have occurred within the short period of up to two minutes, and within the limited space of a few feet just inside the front door and a small porch. Defendant's convictions for both battery and resisting were based on her opposition to the decision to take her grandchild into custody, entailing acts of shoving, punching, and kicking, which appear similar in character and quality. With respect to sequencing, the initial pushing and punching of Sergeant Prudencio and the later resisting occurred within a single overarching episode. No intervening event or break in the actions occurred.

The episode began when Defendant heard that the decision had been made to take custody of one of her grandchildren, and her struggle continued when Sergeant Prudencio tried to put her wrist behind her back. Finally, a review of the relevant testimony at trial shows that Defendant's overarching goal and purpose in committing both the battery and resisting offenses never changed; it was to prevent the officers from taking custody of one of her grandchildren. The foregoing considerations all support the conclusion that Defendant's conduct was unitary.

{12}     We note that the facts in this case bear similarity to the situation addressed by this Court in *Ford*. In *Ford*, the defendant's convictions for resisting, evading, or obstructing an officer and battery on a peace officer were based on his acts of struggling while officers were trying to effectuate an arrest. *Id.* ¶¶ 13-14. The acts occurred close in time, *id.* ¶ 14, and although the struggling and kicking occurred in slightly different places, they were in close proximity. *Id.* ¶ 15. The defendant's acts of struggling and kicking were also similar in quality and nature. *Id.* ¶¶ 14-15. Moreover, the kicking occurred at the conclusion of the larger, continuous episode of struggling, during which no intervening event or break in the action was suggested. *Id.* ¶¶ 13-14. Finally, the defendant's acts occurred in response to the officers' attempts to effectuate an arrest, thereby, having the same object of resistance. *Id.* ¶ 14. Insofar as Defendant's acts underlying the battery and resisting offenses in this case

all occurred in the course of Defendant's attempts to prevent officers from taking custody of her grandchild, which was the single overarching purpose of her actions, we conclude that the facts of the instant case are analogous to those presented in *Ford*. We therefore conclude that the conduct is unitary for double jeopardy purposes. *See id.* ¶ 16 (concluding that the defendant's conduct was unitary).

**{13}** The State's answer brief "recognizes that the acts were not separated by sufficient time or physical distance." However, the State argues that despite this temporal and physical proximity, there was a distinct change in Defendant's conduct at the time when Sergeant Prudencio and Detective Fernandez attempted to detain her, which the State argues was dispositive for the purpose of determining whether there was unitary conduct. *See State v. Bernard*, 2015-NMCA-089, ¶ 26, 355 P.3d 831 ("If a case cannot be resolved from time and space considerations, then resort must be had to the quality and nature of the acts or to the objects and results involved." (internal quotation marks and citation omitted)).

**{14}** The State contends that this case should be deemed more analogous to *State v. Lopez*, 2008-NMCA-111, 144 N.M. 705, 191 P.3d 563. In *Lopez*, the defendant's "act of fleeing was punctuated by a distinct change in character and quality when he stopped fleeing, turned toward the officer in an attack posture, came back to the officer, and punched him twice in the face, drawing blood." *Id.* ¶ 10. Moreover, "at

the time [the d]efendant stopped fleeing and physically attacked the officer, [the d]efendant's purpose changed from simply trying to escape into physical violence directed at the officer." *Id.* Accordingly, both "the quality and nature of the individual acts, and the objectives and results involved, changed significantly[,]" such that the conduct at issue was properly deemed non-unitary. *Id.* (internal quotation marks omitted). The State contends that Defendant's purpose in this case morphed from physical violence directed at the officer, which was offensive in nature when she charged at Sergeant Prudencio, to merely trying to resist detention, which was defensive in nature when the sergeant began to restrain her as a result of her initial attack on him.

{15} We disagree with the State's contention. As we discussed previously, the quality and character of Defendant's conduct did not significantly change in the course of the episode. Unlike the facts presented in *Lopez*, Defendant neither deliberately ceased striking at Sergeant Prudencio nor began to purposefully resist the arrest. To the contrary, Defendant initially came into physical contact with the sergeant by shoving and punching him as she tried to barge into the house after hearing the decision to take custody of her grandchild. When he tried to restrain her due to her physical aggression, she continued to struggle with him and resist the restraint in an effort to go inside and prevent her grandchild from being removed from

10

the home. It appears, therefore, that Defendant's initial acts of shoving and punching were similar in nature to her kicks as she tried to resist the officer's restraint. *See Ford*, 2007-NMCA-052, ¶ 14 (characterizing a kick as similar to other acts of resistance occurring in the course of a struggle to resist arrest).

{16} The State also argues that Sergeant Prudencio's act of trying to restrain Defendant and Defendant's resisting that restraint should be regarded as an indication of changed purpose. Relevant to this, the State contends that Defendant's self-defense theory at trial—which was submitted to but rejected by the jury, as they returned a battery conviction—supports a view of the facts that her demeanor changed from offensive to defensive. We disagree. Sergeant Prudencio began to restrain Defendant after she tried to physically move him out of the way in order to enter the house. Although Defendant may have been reacting to pain from his attempts to restrain her, and her immediate physical responses may have changed in an attempt to get away from his grip, Defendant's overarching objective throughout the episode appears to have been to prevent the officers from taking custody of her grandchild. Stated another way, the attempt to restrain and then arrest Defendant had no apparent effect on Defendant's larger purpose throughout her physical interaction with Sergeant Prudencio.

11

{17}     Finally, the State suggests that Defendant's convictions can be upheld on the theory that she completed the offense of battery when Sergeant Prudencio tried to restrain her, and then she effectuated the crime of resisting when she kicked and struggled to avoid being placed in handcuffs. *See DeGraff*, 2006-NMSC-011, ¶ 27 ("In our consideration of whether conduct is unitary, we have looked for an identifiable point at which one of the charged crimes had been completed and the other not yet committed."). We decline to divide the episode at hand in this manner. Double jeopardy concerns "cannot be avoided by the simple expedient of dividing conduct into a series of temporal and spatial units." *Lopez*, 2008-NMCA-111, ¶ 10. As *Ford* and *Lopez* both illustrate, we must consider the entire uninterrupted episode, rather than artificially compartmentalizing the pertinent events. *See State v. Padilla*, 1983-NMCA-096, ¶¶ 4, 10, 101 N.M. 78, 678 P.2d 706 (stating that, in the context where the defendant was pulled over for driving erratically, he briefly interacted with the officer, got back into his car, drove off, a high speed chase ensued, the defendant finally stopped, two officers struggled to handcuff him, and the defendant kicked one of the officers, the events could not be broken down into discrete parts), *rev'd in part on other grounds*, 1984-NMSC-026, 101 N.M. 58, 678 P.2d 686.

{18}     Because we have concluded that the conduct at issue in this case is unitary, we must proceed to the second step of the double jeopardy analysis. Legislative intent

with respect to the offenses of resisting, evading, or obstructing an officer and battery on a peace officer was evaluated in *Ford*. Comparing the applicable statutory provisions, this Court observed that the elements of the former are subsumed within the elements of the latter. *Ford*, 2007-NMCA-052, ¶¶ 18-21.

**{19}** In this case, the offenses incorporate the same elements as those addressed in *Ford*. Insofar as the elements of resisting are subsumed within the elements of battery on a peace officer, our inquiry is at an end. *See State v. Lee*, 2009-NMCA-075, ¶ 9, 146 N.M. 605, 213 P.3d 509 (observing that "[i]f . . . one statute is subsumed within the other, the inquiry is over and the statutes are the same for double jeopardy purposes—punishment cannot be had for both" (internal quotation marks and citation omitted)).

**{20}** In sum, Defendant was convicted of two offenses arising out of unitary conduct. Because the elements of one these offenses are subsumed within the elements of the other, Defendant's right to be free from double jeopardy was violated. *See Ford*, 2007-NMCA-052, ¶¶ 3, 23. Defendant's conviction for resisting, the lesser-included offense, must therefore be vacated. *See id.*

**Sentencing**

13

{21} Defendant argues that fundamental error occurred when the district court relied on testimony presented during Ms. Romero's sentencing hearing when sentencing Defendant.

{22} At sentencing, the district court referenced Defendant's forensic mental health evaluation, and the district court emphasized Defendant's need for mental health services based on Defendant's behavior in the present case and the information in the evaluation. The State made clear that it did not intend to request additional jail time, but asked that the district court run the counts consecutively and place Defendant on supervised probation. Additionally, the State requested that Defendant have no contact with Mr. and Mrs. Webber, the foster parents of Defendant's grandchild who was taken into CYFD custody as a result of the investigation underlying the instant case, unless the contact was arranged through CYFD. Relevant to this, the State mentioned the holding up of signs around a vehicle and said that it did not want Defendant to use "shame tactics" of that nature, although no further details were provided.

{23} The district court agreed that Defendant should have no contact with the Webbers outside of the CYFD system and sentenced her to four years minus one day, all of which was suspended in favor of supervised probation. Subsequently, defense counsel asked if the court would consider a deferred sentence, which the district court declined to do and explained that it would not be appropriate in light of the facts of

14

the case. The district court ordered Defendant to write a letter of apology to Mr. Webber.

{24} At that juncture, defense counsel, noting that while he thought the discussion about what happened at Ms. Romero's sentencing hearing and the letter for the Webbers were "appropriate" and "great," stated that he had "no knowledge of these things." The district court explained to defense counsel that the Webbers were the foster family who took Defendant's grandchild into their home. The district court further explained that "when this baby came into [the Webbers'] care, he wasn't even responsive," the court had no words to describe the "level of neglect," and highlighted Defendant's harassment of the Webbers, as well as her disrespect for them. Defense counsel thanked the court for explaining.

{25} Defendant argues that her due process rights were violated when the district court relied on information presented at Ms. Romero's sentencing hearing. Defendant characterizes this as a notice problem; specifically, "that she did not have the requisite advanced notice in this case that this information which the [court] learned at a previous sentencing of another defendant would be used against her in her own sentencing." Defendant further asserts that "[a]lthough she may have been aware of these facts, that does not equate to fair notice that they would be used against her at sentencing." Defendant claims that this prejudiced her because she did not receive a

15

deferred sentence. Defendant raises this issue as a matter of fundamental error because, although defense counsel mentioned this at sentencing, he failed to object.

**{26}** In the context of an unpreserved sentencing error, the appellate courts apply the fundamental error doctrine "only under exceptional circumstances and only to prevent a miscarriage of justice." *State v. Castillo*, 2011-NMCA-046, ¶¶ 28-29, 149 N.M. 536, 252 P.3d 760 (internal quotation marks and citation omitted). "The error must shock the conscience or implicate a fundamental unfairness within the system that would undermine judicial integrity if left unchecked." *Id.* ¶ 29 (internal quotation marks and citation omitted).

**{27}** We disagree with Defendant's claim of fundamental error. As an initial matter, with respect to the fact that the district court discussed its recollection of statements made at Ms. Romero's sentencing proceeding, we note that the district court is "permit[ted] . . . to take judicial notice of its own records." *Lopez v. LeMaster*, 2003-NMSC-003, ¶ 32, 133 N.M. 59, 61 P.3d 185. To the extent Defendant argues that her due process rights were violated by this, our case law has explained that in the context of disruptive conduct in open court that the judge personally observed, which we perceive to be analogous to the present circumstances, due process requirements are diminished. *See Concha v. Sanchez*, 2011-NMSC-031, ¶ 27, 150 N.M. 268, 258 P.3d 1060 ("A person who commits disruptive or defiant conduct in the midst of an

ongoing court proceeding within the personal perception of the judge has committed an act of direct criminal contempt and may be punished summarily without further evidentiary proceedings.").

{28} Additionally, the State did not rely on the information from Ms. Romero's sentencing hearing to seek an enhancement of Defendant's sentence, but merely asked that Defendant not have contact with the foster family outside of the CYFD-established structure. *Cf. Caristo v. Sullivan*, 1991-NMSC-088, ¶ 45, 112 N.M. 623, 818 P.2d 401 ("[A] defendant must be given notice of the state's intention to seek aggravation and of the aggravating circumstances on which it intends to rely, unless the circumstance was itself an element of the underlying offense or a fact used to establish such an element."). In sum, because the prior hearing occurred before the same district court, Defendant was responsible for the conduct, and the State did not seek an aggravation, we do not perceive there to be any due process concerns.

{29} We turn next to Defendant's argument that she was prejudiced by any lack of notice of the district court's reliance on statements made at Ms. Romero's sentencing hearing because Defendant should have received a deferred sentence, as opposed to a suspended sentence. *See* NMSA 1978, § 31-20-3 (1985) (explaining orders deferring or suspending sentence). Again, we disagree with Defendant's contentions. In *State*

17

*v. Gardner*, 2003-NMCA-107, ¶ 43, 134 N.M. 294, 76 P.3d 47, this Court recognized the types of evidence that may be relevant at sentencing.

> Our case law allows the court discretion to consider almost any relevant factor or evidence in determining the appropriate sentence. Where the trial court relies on certain information that, in turn, affects a defendant's sentence, then due process may require advance notice to the defendant so that the defendant has the opportunity to challenge the accuracy of the information.

*Id.* (alteration, internal quotation marks, and citation omitted). In *Gardner*, the defendant argued that his due process rights were violated when the prosecution presented testimony about crimes for which he was not charged or convicted, without providing advance notice of such testimony, even though the prosecution did not seek an increase of the basic sentence. *Id.* ¶ 39. This Court noted that there was no indication to suggest that the defendant had been prejudiced by any lack of notice, as the district court did not indicate that it had considered testimony presented by the prosecution at the sentencing hearing when it determined what sentence to impose. *Id.* ¶ 42. Additionally, the Court explained that because the district court did not deviate from the basic sentence, which it was not required to do, irrespective of any mitigating evidence presented by the defendant, there were no due process concerns of the nature addressed by the United States Supreme Court in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and examined by this Court in *State v. Wilson*, 2001-NMCA-032, 130 N.M. 319, 24 P.3d 351. *Gardner*, 2003-NMCA-107, ¶ 42.

18

{30}     In the present case, the district court noted that, in light of the forensic mental health evaluation submitted by defense counsel, efforts must be made to ensure Defendant receives mental health services. The district court elected to suspend the entirety of Defendant's sentence in favor of supervised probation, gave instructions to Defendant to set up an appointment with a mental health provider, and included the requirement that Defendant's probation officer be allowed to monitor Defendant's compliance with her appointments and medications. The decision to suspend Defendant's sentence was an act of judicial clemency, and the district court's decision not to grant a deferred sentence was simply a refusal to grant *further* clemency—it was not an aggravation or enhancement of any sort. *See State v. Sosa*, 1996-NMSC-057, ¶ 8, 122 N.M. 446, 926 P.2d 299 (explaining that "[i]t is settled law in this jurisdiction that a suspended sentence is a matter of judicial clemency to which a defendant may never claim entitlement" and holding that a court's decision not to suspend a defendant's sentence "did not constitute an increase, enhancement, or aggravation of the sentence imposed"). Accordingly, because Defendant was not entitled to a deferred sentence and the district court exercised clemency in suspending the entirety of Defendant's sentence, we perceive no prejudice. We therefore reject Defendant's claim of fundamental error.

**CONCLUSION**

{31} For the foregoing reasons, we conclude that Defendant's convictions for battery on a peace officer and resisting, evading, or obstructing an officer violate double jeopardy. We further conclude that no fundamental error occurred during sentencing. We therefore remand to the district court to vacate Defendant's conviction for resisting, evading, or obstructing an officer, and to resentence Defendant accordingly.

{32} **IT IS SO ORDERED.**


_____

**JONATHAN B. SUTIN, Judge**


**WE CONCUR:**


_____

**MICHAEL E. VIGIL, Judge**


_____

**M. MONICA ZAMORA, Judge**