This memorandum opinion was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v. **No. 31,983**

**MARCOS T. MEJIA,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF LUNA COUNTY**
**Daniel Viramontes, District Judge**

Gary K. King, Attorney General
Corinna Laszlo-Henry, Assistant Attorney General
Santa Fe, NM

for Appellee

Jorge A. Alvarado, Chief Public Defender
Will O'Connell, Assistant Appellate Defender
Santa Fe, NM

for Appellant

## MEMORANDUM OPINION

**SUTIN, Judge.**

**{1}** Defendant Marcos T. Mejia appeals his convictions for two counts of attempted criminal sexual contact of a minor (CSCM) (position of authority), contrary to NMSA 1978, Section 30-28-1 (1963), and NMSA 1978, Section 30-9-13(C)(2)(a) (2003). On appeal, Defendant challenges the sufficiency of the evidence to support his convictions, specifically arguing that he did not use his position of authority as Victim's minister in his attempts to commit CSCM. We affirm.

**BACKGROUND**

**{2}** Defendant is a minister and, at the time of the crimes, Victim was a seventeen-year-old member of his congregation. Defendant's convictions are based on two separate incidents and are premised on jury findings that he attempted to commit the crime of CSCM while using his position of authority as Victim's minister to coerce Victim to submit.

**{3}** The first incident (Count 1) took place in November 2010 when Defendant and his wife visited Victim's home. Victim and her brother, returning from the store, met Defendant and his wife upon their arrival, and Defendant asked Victim to remain outside so that they could talk. When her brother went inside, Defendant picked up Victim and started kissing her forehead, face, and neck. Victim testified that this made her feel uncomfortable and that she told Defendant it would be better to go inside. Once inside, Defendant sat next to Victim on the couch and began to caress

her back above her pants but under her blouse. Victim testified that Defendant's hands moved "within millimeters" of her buttocks and that Defendant stopped when she "took his hands."

{4} The second incident (Count 2) took place about a month later in December 2010. After morning church services, Victim, her cousin, and another girl went to Defendant's home to wrap some presents for congregation members. While her cousin and the other girl were in another room, Defendant began hugging and kissing Victim's forehead, cheeks, and around her mouth until she pulled away and joined the others in the other room. Victim testified that this made her feel uncomfortable and that she believed Defendant noticed she was upset.

{5} Later that day at the church, Defendant called Victim into his office to apologize for what happened at his home. Defendant asked Victim if she was upset, and Victim responded, "no problem." Defendant responded "okay" and proceeded to hug her and kiss her forehead. When Defendant and Victim left his office and walked down the hall to join the rest of the congregation, Defendant grabbed her from behind, lifted her up, and kissed the back of her neck, during which time Victim's blouse lifted up. Defendant let Victim go and caressed her stomach, both under and over her clothes, which Victim described as "in between grabbing it and caressing it." Victim testified that Defendant's hands got "really close" to her breasts and that

Defendant was breathing "stronger than usual." We discuss additional facts later in this Opinion as they are relevant to the incidents and the role of Defendant's status as Victim's minister.

**DISCUSSION**

**Issue and Standard of Review**

{6}     Defendant argues the evidence is insufficient to support his convictions for two counts of attempted CSCM (position of authority), in violation of Section 30-9-13(C)(2)(a) and Section 30-28-1. *See* § 30-9-13(C)(2)(a) ("Criminal sexual contact of a minor . . . perpetrated . . . on a child thirteen to eighteen years of age when . . . the perpetrator is in a position of authority over the child and uses [that] authority to coerce the child to submit[.]"); § 30-28-1 ("Attempt to commit a felony consists of an overt act in furtherance of and with intent to commit a felony and tending but failing to effect its commission.").

{7}     We review the evidence to determine "whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Sutphin*, 1988-NMSC-031, ¶ 21, 107 N.M. 126, 753 P.2d 1314. Under this standard, "[w]e view the evidence in the light most favorable to supporting the verdict and resolve all conflicts and indulge all inferences in favor of upholding the verdict."

4

*State v. Hernandez*, 1993-NMSC-007, ¶ 68, 115 N.M. 6, 846 P.2d 312. We do not re-weigh the evidence, nor substitute our judgment for that of the fact-finder, so long as there is sufficient evidence to support the verdict. *Sutphin*, 1988-NMSC-031, ¶ 21.

**Sufficiency of the Evidence**

{8}     Sufficient evidence was presented from which the jury could have reasonably inferred that Defendant used his position of authority as Victim's minister in his attempts to coerce Victim to submit to CSCM. In his sufficiency challenge, Defendant concedes there was evidence that he attempted to touch Victim's intimate parts, acknowledging that "[Defendant] failed in his attempt to touch the alleged [V]ictim's intimate parts" and "[Victim] testified that [Defendant] did no more than try, and abjectly fail, to touch her intimate parts." Defendant's sufficiency challenge instead focuses on the role his position of authority played in his actions. *See* NMSA 1978, § 30-9-10(E) (2005) (providing that "position of authority" means "that position occupied by a parent, relative, household member, teacher, employer or other person who, by reason of that position, is able to exercise undue influence over a child").

{9}     While agreeing that Victim "was certainly justified in perceiving [Defendant] as an authority figure," Defendant disputes a finding that he used or attempted to use this authority to coerce Victim to submit to CSCM. From Defendant's perspective, he is just a middle-aged man who happens to be a minister whose "hapless advances"

were rebuffed by a seventeen-year-old girl. Thus, while Defendant acquiesces that he was in a position of authority and perhaps could have exercised undue influence to coerce Victim, he argues there was no evidence that he ever invoked such authority. Defendant best sums up his argument with his statement that he "held the authority card[,] but he did not play it."

{10} As an abstract proposition, Defendant's status as a person of authority in the role of Victim's minister does not by itself establish that he used this authority in his attempt to coerce Victim to submit to CSCM. *See State v. Trevino*, 1991-NMCA-085, ¶ 6, 113 N.M. 804, 833 P.2d 1170 (reviewing the employer's CSCM of a minor employee and stating, "[t]his is not to say that the position of employer in and of itself necessarily establishes the use of that position as coercion"). Here, however, our review of the evidence provides that there was ample evidence from which the jury could have inferred that Defendant's role as Victim's minister was the doorway through which Defendant facilitated his attempted sexual abuse. Further, as discussed later in this Opinion, the jury could have inferred that, by virtue of his role as Victim's minister, Defendant was able to gain the trust of Victim and her family, to cause Victim to be afraid and question whether she was "thinking wrongly" about Defendant's actions, to spend time alone with Victim and, ultimately, to gain the opportunity to commit the attempted crimes. *See id.* (concluding that while the

6

position of employer does not necessarily show coercion, "where there exists sufficient connection between the employment and the sexual contact, . . . the jury can appropriately infer that the employer used coercion").

{11} Regarding the use of his role as Victim's minister to gain Victim's trust, evidence was presented that Victim and her family were congregants at the church where Defendant served as minister. Victim was very close with both Defendant and his wife, considering them "like family." After Victim and her boyfriend broke up, Victim discussed her feelings about the breakup with Defendant's wife and sought Defendant's spiritual advice about the breakup. While Defendant had not been particularly close to Victim when she had a boyfriend, he grew closer to Victim after the breakup and, at some point, gave Victim a box of chocolates. *See State v. Gillette*, 1985-NMCA-037, ¶ 31, 102 N.M. 695, 699 P.2d 626 (considering that the victim had a close, confidential relationship with the defendant and frequently sought the defendant's advice as factors in concluding that the defendant used his position of authority to coerce the victim to submit to the sexual acts); *see also State v. Gardner*, 2003-NMCA-107, ¶¶ 33-38, 134 N.M. 294, 76 P.3d 47 (holding that there was sufficient evidence to support a conclusion that the unlawful contact "was at least in part a result of [the assistant principal's] position of authority" and that he used his

position to gain the victims' trust, so as to have an opportunity to touch them and to cause them to submit to his touch).

{12}   Apart from using his position of authority to gain Victim's trust, evidence was presented that Defendant capitalized on his role as Victim's minister to cause Victim to be afraid and to question whether she was "thinking wrongly" about his inappropriate actions. When testifying about the two incidents, Victim related that Defendant's actions made her feel confused and really uncomfortable and that she did not know what to do. Victim testified that she did not want Defendant touching her the way he did, but did not tell him so because she was afraid. When asked about Defendant's temper, Victim testified that when Defendant was upset he was impulsive and that she had seem him shake and start yelling. Victim also testified that Defendant had once mentioned he had a pistol and that this made her feel afraid. Victim further testified that Defendant frequently preached against making allegations of inappropriate touching, saying that "if you were thinking wrongly, those were your thoughts, that was your heart." As a consequence, Victim testified that she herself did not know if Defendant had acted with a bad intention or if she was "thinking wrongly." Similarly, another congregant testified that Defendant preached against people accusing their fellows because God would punish the accuser for his or her sins. Victim testified that everyone in the congregation regarded Defendant with

8

respect and that she did not think people would believe her. And notably, after the second incident, Victim did not return to her church until Defendant was no longer the pastor. *See Trevino*, 1991-NMCA-085, ¶ 5 (considering, among other things, the victim's testimony that he did not tell others of the incident because he was afraid and "didn't know how to handle it" as evidence from which the jury could infer that the defendant used his position of authority to coerce the victim (internal quotation marks omitted)).

{13} Lastly, we consider that Defendant, through his role as Victim's minister and trusted advisor, was able to place himself in situations where he was alone with Victim and thereby gain the opportunity to commit the crimes. To this end, the first incident was precipitated by Defendant asking Victim to wait outside when her brother went inside their home so that he could talk to Victim about a problem she was having. And the second incident was precipitated by Defendant calling Victim into his church office to apologize about his actions earlier at his home. *See State v. Gipson*, 2009-NMCA-053, ¶¶ 24-25, 146 N.M. 202, 207 P.3d 1179 (affirming the jury's determination that the defendant used his position of authority to commit the crimes when the defendant was in the role of a trusted family friend who was allowed to be alone with the victim); *Trevino*, 1991-NMCA-085, ¶ 5 ("In light of [the] defendant's ability to place [the victim] in a confined, private workstation and [the

victim's] testimony that he was scared, we believe the jury could infer that defendant used his position of authority to coerce [the victim] to submit to the sexual contact.").

{14} In sum, while Defendant did not use physical violence in his attempt to coerce Victim, the jury could infer from the evidence that he used a more subtle form of coercion by capitalizing on his role as her minister in his attempts to control her will. *See Gillette*, 1985-NMCA-037, ¶ 32 (recognizing that use of a position of authority to coerce sexual contact may be proved inferentially); *see also Gardner*, 2003-NMCA-107, ¶ 22 (recognizing that undue influence can result from a moral, social, or domestic force exerted upon a party). Despite this improper use of his authority, however, Defendant still maintains that he never "played the authority card" or "press[ed] his advantage" because, after Victim rebuffed his advances, he did not then proceed to assert his authority over Victim to coerce her to submit. What Defendant fails to acknowledge, however, is that Victim's "rebuffing" of his advances was not the triggering mechanism for whether Defendant would then elect to assert his authority. Rather, Defendant had already used his authority throughout his interactions with Victim as a precursor to and part of a subtle "grooming behavior," leading up to the specific incidents for which he attempted to coerce Victim to submit. Thus, after being rebuffed, whether Defendant elected to again attempt to overtly

coerce Victim is not determinative because Defendant had already played his "authority card," but failed in his attempt to coerce Victim to submit.

{15} We further disagree with Defendant's argument that the evidence does not support a finding of coercive use of his authority because Victim "had no real difficulty in thwarting [his] sexual advances[.]" Related to this, Defendant argues that his "powerlessness to touch [Victim's] intimate areas demonstrates not a use of his position of authority but, if anything, its opposite." We disagree. As emphasized by the State throughout its answer brief, it was Defendant's intent to exercise undue influence and to compel submission that was determinative, not whether he actually succeeded in doing so. *See* § 30-28-1 (attempting to commit a felony requires "an overt act in furtherance of and with intent to commit" the crime). Victim's rebuffing of Defendant's advances does not preclude a finding that Defendant used his authority in an attempt to coerce Victim and in fact provides some insight into why Defendant failed in his attempts to touch Victim's intimate parts, thereby leading to his convictions for attempted CSCM rather than CSCM.

{16} Lastly, we point out that affirmance is consistent with *State v. Segura*, 2002-NMCA-044, 132 N.M. 114, 45 P.3d 54, which addresses the distinction in proof between a completed versus attempted CSCM by a person in a position of authority. In *Segura*, this Court reversed the defendant's convictions for attempted CSCM

11

because the submitted jury instruction did not make it clear to the jury "that the initiatory crime of attempt applied to all elements of the underlying crime." *Id.* ¶¶ 12, 16. Specific to this, the submitted jury instruction in *Segura* recited as an element of the crime that "[t]he defendant was a person who by reason of his relationship to [the c]hild was able to exercise undue influence over [the c]hild and used this authority to force or coerce her to submit to sexual contact[.]" *Id.* ¶ 12 (alterations and internal quotation marks omitted).

{17}    Absent any extension of the attempt aspect of the crime to the position of authority element, *Segura* concluded that the submitted jury instruction became "the law of the case against which the sufficiency of the evidence is to be measured." *Id.* ¶ 13 (internal quotation marks and citation omitted). As a consequence, even though the defendant was charged with attempted CSCM, "in order to convict [the d]efendant, the jury was required to determine beyond a reasonable doubt [the d]efendant by reason of his position of authority was *actually* able to exercise undue influence over [the c]hild and *succeeded* in forcing or coercing her to submit to sexual contact through the use of that position of authority." *Id.* And because there was no evidence that the child "was at all actually unduly influenced to submit to any sexual contact[,]" *Segura* reversed. *Id.* ¶¶ 15-16. In doing so, however, and significantly, *Segura* emphasized that had the jury been properly instructed on an attempt crime, "the jury

would have been on solid grounds to draw reasonable inferences from the circumstances to convict [the d]efendant of attempt to commit CSCM (position of authority)." *Id.* ¶ 16. Unlike *Segura*, in the present case, the jury instruction follows the format for attempt crimes, as set forth in UJI 14-2801 NMRA (felony attempt crimes), instructing that Defendant intended to commit CSCM by use of coercion by a person in authority and "began to do an act which constituted a substantial part of [CSCM] by use of coercion by a person of authority[.]"

**CONCLUSION**

{18}    Based on the foregoing discussion and viewing the evidence in the light most favorable to the State in light of all the circumstances, we conclude that there was ample evidence from which the jury could conclude that Defendant used his authority in his attempts to coerce Victim to submit to sexual contact. *See generally State v. Sparks*, 1985-NMCA-004, ¶ 6, 102 N.M. 317, 694 P.2d 1382 (defining "substantial evidence" as evidence that a reasonable mind would consider adequate to support a defendant's conviction). We therefore affirm Defendant's convictions.

{19}    **IT IS SO ORDERED.**

_____
**JONATHAN B. SUTIN, Judge**

13

**WE CONCUR:**

_____
**LINDA M. VANZI, Judge**

_____
**J. MILES HANISEE, Judge**