## IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2018-NMSC-026

Filing Date: March 9, 2018

Docket No. S-1-SC-36000

STATE OF NEW MEXICO,

Plaintiff-Petitioner,

v.

OSCAR ARVIZO,

Defendant-Respondent.

ORIGINAL PROCEEDING ON CERTIORARI
Briana H. Zamora, District Judge

Hector H. Balderas, Attorney General
Laura Erin Horton, Assistant Attorney General
Santa Fe, NM

for Petitioner

Bennett J. Baur, Chief Public Defender
Steven James Forsberg, Assistant Appellate Defender
Santa Fe, NM

for Respondent

## OPINION

**MAES, Justice.**

**{1}** In this case we consider whether a child victim's opposition to sexual contact by a relative, after the contact already occurred, negates the element of coercion. Defendant Oscar Arvizo was found guilty of two counts of criminal sexual contact of a minor (CSCM) by a person in a position of authority—one in the second degree and one in the third degree. *See* NMSA 1978, § 30-9-13(B)(2)(a), (C)(2)(a) (2004). The Court of Appeals reversed the two convictions, holding that the evidence failed to prove that Defendant "used his position of authority to coerce A.B. to submit to criminal sexual contact[s]" because "when both

1

sexual contacts took place without warning, A.B. immediately pushed Defendant away." *State v. Arvizo*, No. 33,697, mem. op. ¶¶ 24-25 (N.M. Ct. App. June 28, 2016) (non-precedential).

**{2}** The State sought further review of a single issue: whether "the Court of Appeals erroneously [held] that a child's physical resistance after the fact negates other evidence for the element of coercion by a person in a position of authority in a conviction for CSCM." We granted certiorari under Rule 12-502 NMRA. We reverse the Court of Appeals and reinstate the convictions. We remand the case back to the Court of Appeals to consider any remaining appellate issues presented by Defendant.

## I.    BACKGROUND

**{3}** In December 2009, Valerie Barreras and her husband Anthony Barreras had two daughters—A.B., then thirteen years old, and her younger sister S.B., then six years old. Defendant was married to Valerie's sister Darlene, making him A.B.'s uncle. Defendant and Darlene had four young children of their own. Valerie and Darlene were very close, and the two families often spent time together at the Barreras house, at social events, and at Valerie's and Darlene's parents' house.

**{4}** Defendant's family went to dinner with the Barreras family on a Friday evening that December to celebrate a bonus Anthony had received earlier that day. The families returned to the Barreras home for a sleepover as they had often done in the past.

**{5}** Shortly after the families returned home from dinner, A.B. accompanied S.B. to the bathroom. In the hallway leading to the bathroom, they encountered Defendant, who grabbed A.B.'s buttock as they passed. A.B. was surprised and pushed his hand away but said nothing as she and S.B. continued on to the bathroom. Defendant laughed afterward. A.B. gathered herself in the bathroom, came out, and said nothing about what had happened.

**{6}** Later that evening, the four adults went to bed and four of the children eventually fell asleep on a pull-out couch in the living room as they had many times before. At some point that night, A.B. awoke and discovered Defendant hovering over her with his hand directly on the "outer lip" of her "private area." Her pajama pants, she found, had been lowered to her mid-thigh. Reacting, she exclaimed, "What are you doing?" and "Get off me." Defendant responded by whispering in her ear, "I'm looking for your pussy, so I can stick my finger in it." A.B. pushed Defendant off, and Defendant returned to the bedroom he and Darlene were sharing that night. A.B. ran to her own bedroom. She locked the door, went to her closet, ripped up her pajama pants, cried for a time, and eventually fell asleep with the lights on.

**{7}** Early the next morning, Defendant walked into A.B.'s bedroom and asked A.B., "Are you going to tell anybody?" A.B.'s father, Anthony, passing through the hallway at the time, overheard Defendant broaching the question. Anthony asked, "Tell anybody about what?"

2

Defendant quickly fabricated a story, explaining he had accidentally tripped A.B. that night, she had hurt her knee, and he had been hoping to ensure nobody thought he had intended to cause the injury. Anthony observed A.B. to see if Defendant's story and explanation were true, and A.B. lowered her head and nodded in agreement.

**{8}** At first, A.B. resolved to keep the events of that evening to herself. The two families were very close. A.B. testified that she was reluctant to upset the dynamic, and she was afraid nobody would believe her if she said anything. Eventually, however, she began cutting herself, and the cutting soon became evident to her parents.

**{9}** After a Father's Day barbecue in June 2010, more than six months after the December sleepover, Anthony, alarmed about the cutting, took A.B. to a hospital. As they sat in the parking lot before entering the hospital, they had a long and emotional conversation as Anthony attempted to identify the source, or sources, of A.B.'s behavior. After much initial reluctance, A.B. eventually revealed the abuse to her father.

**{10}** Defendant was charged in an amended grand jury indictment with four counts: In Count 1, CSCM of a child thirteen to eighteen years old in the second degree by a person of authority, for the unclothed contact with the vagina; and in Count 3, CSCM in the third degree by a person of authority for the clothed contact with the buttock. Both the CSCM counts further alleged that "[D]efendant was a person who by reason of his relationship to A.B. was able to exercise undue influence over A.B. and used this authority to coerce A.B. to submit to sexual contact," and cited Section 30-9-13(A). In Count 2, Defendant was charged with attempted criminal sexual penetration in the second degree of a child thirteen to eighteen years old; and in Count 4, with bribery or intimidation of a witness. *See* NMSA 1978, §§ 30-28-1 (1963), 30-9-11 (2009), 30-24-3(A)(3) (1997).

**{11}** After a six-day trial, a jury convicted Defendant of all four charges. The district judge who had presided over the trial recused himself from the case two days after the trial. After post-trial motions, a new district judge vacated the conviction for attempted criminal sexual penetration on double jeopardy grounds but left the remaining convictions intact. The district court sentenced Defendant to twenty-four years imprisonment, fourteen years of which were suspended, for an actual sentence of ten years.

**{12}** Defendant appealed, advancing ten claims, but the Court of Appeals only addressed three: that his right to a speedy trial was violated, that the evidence was insufficient to support the conviction on either count of CSCM, and that the evidence was insufficient to support the conviction for bribery or intimidation of a witness. *Arvizo*, No. 33,697, mem. op. ¶ 2. The Court of Appeals held that defendant failed to establish that the nearly thirty-six month delay caused him prejudice, affirmed the conviction for witness intimidation, but vacated both CSCM convictions upon insufficient evidence and remanded the case for entry of judgment and sentence on two counts of simple battery as proven lesser included offenses. *Id.* ¶¶ 12-13, 17, 24-25, 34.

3

## II. STANDARD OF REVIEW

**{13}** When examining a sufficiency-of-the-evidence claim, we consider "whether, after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Treadway*, 2006-NMSC-008, ¶ 7, 139 N.M. 167, 130 P.3d 746 (internal quotation marks and citation omitted). The Court views the evidence in the light most favorable to the guilty verdict and indulges all reasonable inferences and resolves all conflicts in the evidence in favor of the verdict. *Id.* The Court will not reweigh the evidence or substitute its judgment for the judgment of the fact-finder. *Id.* To the extent the challenge here implicates proper construction of the CSCM statute, however, the Court's review is de novo. *See, e.g.*, *State v. Myers*, 2009-NMSC-016, ¶ 13, 146 N.M. 128, 207 P.3d 1105 (setting forth standards of review for a case involving both a sufficiency claim and an issue of statutory construction).

## III. DISCUSSION

**{14}** Section 30-9-13(A) defines CSCM as "the unlawful and intentional touching of or applying force to the intimate parts of a minor" including "the primary genital area, groin, buttocks, anus or breast." Second-degree CSCM occurs when the perpetrator touches the unclothed intimate parts of a child thirteen to eighteen years of age and is "in a position of authority over the child and uses that authority to coerce the child to submit." Section 30-9-13(B)(2)(a). Third-degree CSCM is identical to second-degree CSCM except that the child victim is clothed. *See* § 30-9-13(C). The term "position of authority" is defined as "that position occupied by a parent, relative, household member, teacher, employer or other person who, by reason of that position, is able to exercise undue influence over a child." NMSA 1978, § 30-9-10(E) (2005).

**{15}** As to the element of coercion, the jury was instructed that it must find Defendant was "a relative who by reason of [his] relationship to [A.B.] was able to exercise undue influence over [A.B.] AND used this authority to coerce [A.B.] to submit to sexual contact." *See* UJI 14-926 NMRA. In *State v. Gardner*, the Court of Appeals held that

> [c]oercion for the purposes of CSCM occurs when a defendant occupies a position which enables that person to exercise undue influence over the victim and that influence must be the means of compelling submission to the contact. . . . [S]uch coercion might take many forms but is less overtly threatening than physical force or threats.

2003-NMCA-107, ¶ 22, 134 N.M. 294, 76 P.3d 47 (second alteration and omission in original) (internal quotation marks and citation omitted).

**{16}** The State argues that under the statutory definition of "force or coercion," a sleeping victim is necessarily a coerced victim. Section 30-9-10(A)(4) defines "force or coercion" as "the perpetration of . . . criminal sexual contact when the perpetrator knows or has reason

4

to know that the victim is . . . asleep . . . . Physical or verbal resistance of the victim is not an element of force or coercion." Therefore, the State contends that the element of coercion was met when Defendant touched A.B. as she slept and that her resistance afterward should not have been considered.

**{17}** The CSCM statute enumerates alternative methods of committing the offense, with each method having slightly different elements to be proven beyond a reasonable doubt. *See* § 30-9-13. For example, the commission of the offense when the perpetrator uses "force or coercion that results in personal injury to the child" is one form or method of second-degree CSCM. *See* § 30-9-13(B)(2)(b). In this case, Defendant was charged with committing the "position of authority" method of CSCM in the second degree. *See* § 30-9-13(B)(2)(a). The State asks this Court to apply the definition for an element of a crime Defendant was not alleged to have committed. The committee commentary for UJI 14-926—the instruction given to the jurors— specifically states that the statutory definition of "force or coercion" that the State relies on "has no application" to the "position of authority" method of committing the crime of CSCM. Because Defendant was not charged with "force or coercion" CSCM and the commentary indicates that element has no application to "position of authority" CSCM, the definition of "force or coercion" is not applicable here.

**{18}** The State next argues that the Court of Appeals incorrectly analogized this case to *State v. Segura*, 2002-NMCA-044, 132 N.M. 114, 45 P.3d 54. In *Segura*, the defendant made sexually explicit overtures toward his thirteen-year-old niece and grabbed the child's hand in an attempt to make the child touch his groin. *Id.* ¶ 4. The child successfully resisted the defendant's attempts and no sexual contact occurred. *Id.* The defendant was tried and convicted of two counts of attempted criminal sexual contact of a minor (position of authority), under NMSA 1978, Section 30-9-13(A)(2)(a) (1991) and Section 30-28-1. *Segura*, 2002-NMCA-004, ¶ 5. The defendant appealed on the grounds of double jeopardy and insufficient evidence. *Id.* ¶ 7, 10.

**{19}** The Court of Appeals noted that although the defendant was charged with attempted CSCM, the jury was not properly instructed "in a manner [that] insure[d] all elements of the underlying crime were properly placed within the context of the initiatory crime of attempt." *Id.* ¶ 16. "Thus . . . the jury was required to determine beyond a reasonable doubt that [the d]efendant by reason of his position of authority was *actually* able to exercise undue influence over [the c]hild and *succeeded* in forcing or coercing her to submit to sexual contact through the use of that position of authority." *Id.* ¶ 13. Because there was no evidence the defendant actually coerced or caused the child to submit to sexual contact, the Court correctly concluded that "there was insufficient evidence to convict [the d]efendant as a person in a position of authority . . . under the law of the case as given to the jury." *Id.* ¶ 17 (citation omitted). Importantly, the *Segura* Court stated that "[h]ad the jury been properly instructed, the jury would have been on solid grounds to draw reasonable inferences from the circumstances to convict [the d]efendant of attempt to commit CSCM (position of authority)." *Id.* ¶ 16. The outcome of *Segura* hinged more upon the jury instructions than the facts surrounding the child's resistance against the attempted CSCM.

5

**{20}** Nevertheless, the Court of Appeals found *Segura* most instructive to this case. *See Arvizo*, No. 33,697, mem. op. ¶ 23. The Court of Appeals correctly identified that the critical fact in *Segura* was "the child . . . successfully resisted the defendant's attempts to force sexual contact" but then concluded that the outcome in *Segura* was premised on the child's resistance rather than the particularities of the jury instructions. *Id.* This mischaracterization of the holding of *Segura* leads the Court of Appeals to conclude that A.B. was not coerced because, like the child in *Segura*, she immediately resisted. *Arvizo*, No. 33,697, mem. op. ¶ 24.

**{21}** A person in a position of authority does not have to use threats or physical force to coerce a child to submit to sexual contact. *See Gardner*, 2003-NMCA-107, ¶ 22. A child can be coerced through subtle social or domestic pressure on the part of the perpetrator, but a perpetrator does not have to ultimately influence the child's state of mind such that the child passively acquiesces and does not resist. *Id.* The exercise of undue influence resulting in the submission to sexual contact can be inferred by a child's reluctance or fear to report the sexual contact.

**{22}** The Court of Appeals' emphasis on A.B.'s resistance to the exclusion of other evidence is misplaced. Though a child's resistance may have some relevance to the element of coercion, the primary focus of the analysis should be on the perpetrator's actions, not the victim's. *See* UJI 14-926 Comm. cmt. ("The meaning of 'coerce' in this offense is uniquely related to the status of the defendant.").

**{23}** In this case, there was sufficient evidence presented at trial for the jury to find that Defendant exercised undue influence over A.B. such that she submitted to sexual contact on both occasions. The evidence established that Defendant was A.B.'s relative and that Defendant's family slept over approximately once a month at A.B.'s house. A.B. testified she felt pressure not to interfere with the family dynamics given the close relationship between her mother and Darlene, Defendant's wife. There was evidence that Defendant had some degree of authority over A.B. and that she felt she had to show Defendant proper respect. A.B. testified Defendant could tell her "to be quiet," and that he, as "an elder," could tell her not to misbehave. Valerie indicated to an investigator that Defendant was "a parent figure" when he was in the Barreras home, that the children knew they had to listen to him, and that they knew they had to respect him.

**{24}** The nature of the relationship between Defendant and A.B and A.B.'s testimony that she was afraid of what would happen if she disclosed the abuse is sufficient for a jury to infer Defendant was in a position of authority over the child and used that authority to coerce the child to submit to sexual contact. *Gardner*, 2003-NMCA-107, ¶ 38 (holding "the jury [may] infer a connection between [the d]efendant's position of authority and his sexual contact with the victims, which is sufficient to infer the existence of coercion"). We hold that coercion by a person in a position of authority does not require an affirmative forceful act or a warning that the sexual contact is about to happen. Defendant had committed CSCM in the second degree when he touched A.B.'s unclothed genital area and had committed

6

CSCM in the third degree when he touched her clothed buttock. Accordingly, there was sufficient evidence that Defendant coerced A.B. and this was not negated because she pushed Defendant's hand away after each sexual contact.

## IV.    CONCLUSION

**{25}**    We reverse the Court of Appeals and reinstate Defendant's convictions for second- and third-degree CSCM. We remand the case to the Court of Appeals to decide any remaining unaddressed appellate issues raised by Defendant.

**{26}    IT IS SO ORDERED.**

_____
**PETRA JIMENEZ MAES, Justice**

**WE CONCUR:**

_____
**JUDITH K. NAKAMURA, Chief Justice**

_____
**EDWARD L. CHÁVEZ, Justice**

_____
**CHARLES W. DANIELS, Justice**

_____
**BARBARA J. VIGIL, Justice**

7