# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**Opinion Number: 2020-NMCA-007**

**Filing Date: August 12, 2019**

**No. A-1-CA-36391**

**STATE OF NEW MEXICO,**

      Plaintiff-Appellee,

v.

**MARCOS FIGUEROA,**

      Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF SIERRA COUNTY**
**Matthew G. Reynolds, District Judge**

Certiorari Denied, November 19, 2019, S-1-SC-37904. Released for Publication
February 11, 2020.

Hector H. Balderas, Attorney General
Eran Shemuel Sharon, Assistant Attorney General
Santa Fe, NM

for Appellee

L. Helen Bennett, P.C.
L. Helen Bennett
Albuquerque, NM

for Appellant

## OPINION

**IVES, Judge.**

**{1}** A jury convicted Marcos Figueroa (Defendant) of two counts of criminal sexual penetration of a minor (CSPM) in the second degree (CSPM-II) perpetrated against a child between the ages of thirteen and eighteen through force or coercion contrary to NMSA 1978, Section 30-9-11(E)(1) (2009). On appeal, Defendant argues that (1) the use of an inapplicable jury instruction was fundamental error; (2) insufficient evidence supports his conviction; and (3) the district court incorrectly credited only the portion of

Defendant's pretrial release that he spent under house arrest towards his sentence. We reverse Defendant's convictions, remand for a new trial, and affirm the district court's order regarding credit for time spent on pretrial release.

**BACKGROUND**

{2}    The State charged Defendant by criminal information with four counts of CSPM-II committed against his underage son, G.F., and two counts of CSPM-II committed against his underage stepson, A.C. At trial, all of these charges were dismissed save two—Counts 4 and 5, which related to G.F. and were identical except for the charged timeframe. They alleged:

> That between June 01, 2014[,] and July 01, 2014, [for Count 4, and September 01, 2014, and October 7, 2014, for Count 5, D]efendant did cause [G.F.] to engage in sexual intercourse/anal intercourse/cunnilingus/ fellatio, and [G.F.] was at least thirteen but less than eighteen years of age, a second degree felony for a sexual offense against a child[.]

The amended information alleged that this conduct violated Section 30-9-11(E)(1), which proscribes CSPM perpetrated "by the use of force or coercion on a child thirteen to eighteen years of age[.]"

{3}    G.F. provided the only testimony at trial regarding the two incidents on which Counts 4 and 5 were based. The substance of his testimony was as follows:

STATE:    [B]etween June 1 of 2014 and July 1 of 2014, what did your father do to you when you say he molested you?
G.F.:    I woke up in the living room upstairs, I can't remember if I was in the recliner with it opened and laying down or if I had two of the recliners next to each other and I was laying across that, but I was upstairs laying in those, and I woke up, but he didn't know I did, to my pants pulled down, and he was doing oral.
STATE:    He was performing oral sex?
G.F.:    Yes.
STATE:    When you say oral sex . . . what was he doing exactly?
G.F.:    He had his mouth on my penis.
STATE:    Did he ever know you woke up?
G.F.:    Not that I know.
STATE:    And did he say anything about it?
G.F.:    No.
. . . .
STATE:    Had you ever told him "don't do that"?
G.F.:    No.
STATE:    Did he ever say anything to you when he did this?
G.F.:    He did not.

| | |
|---|---|
| STATE: | Now, later that year, between September 1, 2014, and October 7[,] 2014, did your father also perform oral sex on you? |
| G.F.: | Yes. |
| STATE: | Tell me about what you remember about that incident. |
| G.F.: | I was downstairs in my room, in my bed, I was sleeping, I woke up, again my pants were down, and the same thing was happening, he was, oral sex. |
| . . . . | |
| STATE: | Describe what he was doing when you say 'oral sex.' |
| G.F.: | He had his mouth over my penis. |
| . . . . | |
| STATE: | Did he pull your pants back up when he was done? |
| G.F. | He did. |
| . . . . | |
| STATE: | Do you remember what time of day it was? |
| G.F.: | It was nighttime; I was in bed, sleeping. |

G.F. testified that he was sixteen years old at the time of trial, making him either thirteen or fourteen at the time this abuse occurred.

**{4}** The parties discussed jury instructions with the district court following the close of evidence. The court expressed some confusion as to the applicable instructions and noted that it had been presented with alternative theories of the case, one of which involved the use of "physical force," *see* NMSA 1978, § 30-9-10(A)(1) (2005). In response, the State disavowed any reliance on a "physical force" theory of CSPM-II. Instead, the prosecutor informed the court, the State's "theory of the case [was] that Defendant, by reason of his relationship [with G.F.], was able to exercise undue influence over [G.F.] and used his position to coerce him to submit to the act." The prosecutor asserted that that theory was supported by the trial evidence "because that's what the testimony [was,]" summarizing the State's position as "[t]he child woke up, [Defendant] was there, the child continued to lie there because . . . it was his dad doing it."

**{5}** Defendant did not object to instructions based on a "position of authority" theory, and the district court consequently instructed the jury on the elements of "position of authority" CSPM-II. The jury found Defendant guilty of both counts under the given instructions. Defendant appeals.

**DISCUSSION**

**I.    Fundamental Error Occurred Because the Jury Convicted Defendant  Under an Invalid Legal Theory**

**{6}** Defendant contends that we must reverse his conviction because it was error for the district court to instruct the jury on "position of authority" CSPM-II. Defendant failed

to preserve this claim of error at trial, and we therefore review only for fundamental error. *State v. Stevens*, 2014-NMSC-011, ¶ 42, 323 P.3d 901. Under fundamental error review, we first determine "whether a reasonable juror would have been confused or misdirected by the [given] instruction." *State v. Benally*, 2001-NMSC-033, ¶ 12, 131 N.M. 258, 34 P.3d 1134 (internal quotation marks and citation omitted). Confusion or misdirection may result from instructions that are "facially contradictory or ambiguous," as well as those that, "through omission or misstatement, fail to provide the juror with an accurate rendition of the relevant law." *Id.* "If . . . a reasonable juror would have been confused or misdirected, then we review the entire record, placing the jury instructions in the context of the individual facts and circumstances of the case, to determine whether the defendant's conviction was the result of a plain miscarriage of justice." *State v. Candelaria*, 2019-NMSC-004, ¶ 31, 434 P.3d 297 (internal quotation marks and citation omitted). To the extent that our analysis involves issues of statutory interpretation, our review is de novo. *State v. Arvizo*, 2018-NMSC-026, ¶ 13, 417 P.3d 384.

**{7}** The instructions the district court gave informed the jury that, "to find [D]efendant guilty of criminal sexual penetration of a child [thirteen] to [eighteen] by use of coercion by a person in a position of authority[,]" it had to find beyond a reasonable doubt:

1. [D]efendant caused [G.F.] to engage in fellatio;

2. [G.F.] was at least [thirteen] but less than [eighteen] years old;

3. [D]efendant was a person who by reason of his relationship to [G.F.] was able to exercise undue influence over [G.F.] and used his position of authority to coerce him to submit to the act;

4. This happened in New Mexico on or between June 1, 2014, and July 1, 2014[, for Count 4, and on or between September 1, 2014, and October 7, 2014, for Count 5].

These instructions were modelled on an inapplicable uniform jury instruction, UJI 14-945 NMRA. Its use note states that the instruction "is only to be used in cases based on crimes that occurred before the [Legislature's] 2007 amendment [of Section 30-9-11]."

**{8}** Before the amendment, Section 30-9-11(D)(1) (2003) classified as CSPM-II all CSPM perpetrated "on a child thirteen to eighteen years of age when the perpetrator is in a position of authority over the child and uses this authority to coerce the child to submit[.]" As of July 1, 2007, however, Section 30-9-11 no longer contains any reference to "position of authority" CSPM. Instead, Section 30-9-11(E)(1) now provides that all CSPM perpetrated "by the use of force or coercion on a child thirteen to eighteen years of age" is CSPM-II. Because the law in effect at the time a criminal offense is committed is controlling, *State v. Lucero*, 2007-NMSC-041, ¶ 14, 142 N.M. 102, 163 P.3d 489, the current version of Section 30-9-11 was the statute applicable to the

charges Defendant faced, and the district court erred by instructing the jury on "position of authority" CSPM-II.

**{9}**     The State argues that we should not reverse because the given "position of authority" instructions required the jury to find that Defendant "coerce[d]" G.F. and therefore contained every essential element of "force or coercion" CSPM-II. We disagree.[1] The plain language of our sex offense statutes and precedent interpreting those statutes demonstrate that the given instructions would have confused or misled a reasonable juror because they omitted the essential element of "force or coercion" and included the legally irrelevant elements of "position of authority" CSPM-II.

**{10}**     "[F]orce or coercion," as that phrase is used in Section 30-9-11, has five alternative definitions:

> (1)     the use of physical force or physical violence;
>
> (2)     the use of threats to use physical violence or physical force against the victim or another when the victim believes that there is a present ability to execute the threats;
>
> (3)     the use of threats, including threats of physical punishment, kidnapping, extortion or retaliation directed against the victim or another when the victim believes that there is an ability to execute the threats;
>
> (4)     the perpetration of criminal sexual penetration or criminal sexual contact when the perpetrator knows or has reason to know that the victim is unconscious, asleep or otherwise physically helpless or suffers from a mental condition that renders the victim incapable of understanding the nature or consequences of the act; or
>
> (5)     the perpetration of criminal sexual penetration or criminal sexual contact by a psychotherapist on his patient, with or without the patient's consent, during the course of psychotherapy or within a period of one year following the termination of psychotherapy.

NMSA 1978, § 30-9-10(A) (2005). These statutory definitions control; a jury may only find "force or coercion" when the State proves one or more of them. The ordinary meaning of "coerce" therefore has no bearing on whether CSPM has been perpetrated through "force or coercion" insofar as it encompasses a range of conduct broader than those definitions.

---

1 We reached the opposite conclusion in *State v. Sarabia*, No. 31,155, mem. op., 2014 WL 5865104 (N.M. Ct. App. Oct. 6, 2014) (non-precedential). In that case, we held that a given "position of authority" instruction contained the element of "force or coercion" because the given instruction required the jury to find that the defendant "coerced" the victim. *Id*. ¶¶ 30-31. We disapprove of that reasoning for the reasons discussed in the text.

**{11}** Moreover, "coerc[ion]" did not appear as an isolated element in the given instructions. Instead, those instructions informed the jury that it could convict Defendant only if it found that he had committed the CSPM by "us[ing] his position of authority to coerce [G.F.] to submit to the [fellatio]." The word "coerc[ion]" in that context has an entirely different meaning than "force or coercion":

> Coercion [under a "position of authority" theory] occurs when a defendant occupies a position which enables that person to exercise undue influence over the victim and that influence [is] the means of compelling submission to the contact. Such coercion might take many forms but is less overtly threatening than physical force or threats. Undue influence results from moral, social, or domestic force exerted upon a party, so as to control the free action of his or her will.

*State v. Gardner*, 2003-NMCA-107, ¶ 22, 134 N.M. 294, 76 P.3d 47 (internal quotation marks and citations omitted, alteration and omission incorporated); *see Arvizo*, 2018-NMSC-026, ¶ 21 ("A person in a position of authority does not have to use threats or physical force to coerce a child to submit to sexual contact. A child can be coerced through subtle social or domestic pressure on the part of the perpetrator[.]" (citation omitted)); *see also* UJI 14-945 comm. cmt. ("Only one instruction was prepared for this method of committing the crime of criminal sexual penetration because the term 'force or coercion' has no application.").[2] None of the statutory definitions set out in Section 30-9-10 permit a finding of "force or coercion" upon proof that a defendant has used "undue influence"—i.e. "moral, social, or domestic force[,]" *Gardner*, 2003-NMCA-107, ¶ 22 (internal quotation marks and citation omitted)—to perpetrate CSPM, and the jury's finding here that Defendant "coerce[d]" G.F. thus cannot support Defendant's conviction for CSPM-II.

**{12}** Because the given instructions would have confused or misdirected a reasonable juror, we must determine whether Defendant's conviction was "the result of a plain miscarriage of justice." *Candelaria*, 2019-NMSC-004, ¶ 31 (internal quotation marks and citation omitted). The State asserts that no miscarriage of justice occurred because "the evidence that G.F. was asleep would . . . have established the essential element of force or coercion under the updated UJI." In essence, the State contends that this Court should affirm Defendant's conviction for the nonexistent crime of "position of authority" CSPM-II because the evidence at trial established one of the actual statutory definitions of "force or coercion"—"the perpetration of criminal sexual penetration . . . when the perpetrator knows or has reason to know that the victim is . . . asleep[.]" Section 30-9-10(A)(4). We disagree.

**{13}** The doctrine of fundamental error requires us to reverse a criminal conviction when "an error implicate[s] a fundamental unfairness within the system that would

---

2 Both *Gardner* and *Arvizo* interpreted NMSA 1978, Section 30-9-13, which criminalizes sexual contact of a minor (CSCM), rather than Section 30-9-11, the CSPM statute. The language used for the "position of authority" method of commission in the CSCM statute is substantively identical to the formulation of that method as it existed in the CSPM statute prior to 2007. *Compare* § 30-9-13(B)(2)(a), (C)(2)(a) (2003), *with* § 30-9-11(D)(1) (2003).

undermine judicial integrity if left unchecked." *State v. Barber*, 2004-NMSC-019, ¶ 18, 135 N.M. 621, 92 P.3d 633 (internal quotation marks and citation omitted). It is fundamentally unfair, and thus per se fundamental error, to convict a criminal defendant of a nonexistent crime, regardless of whether the evidence would have been sufficient to prove a crime that the law does recognize. *See Campos v. Bravo*, 2007-NMSC-021, ¶¶ 19-21, 141 N.M. 801, 161 P.3d 846 (holding that a conviction must be reversed when the jury returns a general verdict after being instructed on alternative valid and invalid bases of conviction and the reviewing court cannot conclude beyond a reasonable doubt that the jury chose the valid basis); *State v. Maestas*, 2007-NMSC-001, ¶ 9, 140 N.M. 836, 149 P.3d 933 ("It is fundamental error to convict a defendant of a crime that does not exist.").

**{14}** A conviction for "position of authority" CSPM-II based on conduct occurring after the 2007 amendment of Section 30-9-11 is a legal nullity. We could not uphold Defendant's conviction if the jury had returned a general verdict of guilty after being instructed on both "position of authority" CSPM and the "sleeping victim" method of committing CSPM-II that the State now asserts was indisputably established. *See Campos*, 2007-NMSC-021, ¶ 19. It would be absurd for us to do so where the only possible basis for the jury's verdict was legally inadequate. It was a miscarriage of justice to convict Defendant of "position of authority" CSPM-II because that crime did not exist at the time the CSPM at issue was alleged to have occurred. Defendant's conviction was therefore "fundamentally unfair notwithstanding [his] apparent guilt[,]" *Barber*, 2004-NMSC-019, ¶ 17, and we must reverse his conviction.[3]

**{15}** Moreover, we would be compelled to reverse even if our fundamental error doctrine allowed us to conclude that the evidence and verdict indisputably establish Defendant's guilt under the State's newly-discovered sleeping victim theory. The constitutional guarantees of notice, N.M. Const. art. II, § 14, and due process, U.S. Const. amend. XIV, § 1; N.M. Const. art. II, § 18, both prohibit this Court from affirming a criminal conviction under a legal theory different than that on which the case was tried. An appellate court "cannot affirm a criminal conviction on the basis of a theory not presented to the jury[.]" *Chiarella v. United States*, 445 U.S. 222, 236 (1980); *accord McCormick v. United States*, 500 U.S. 257, 270 n.8 (1991) ("Appellate courts are not permitted to affirm convictions on any theory they please simply because the facts necessary to support the theory were presented to the jury."); *Cole v. Arkansas*, 333

---

[3] Defendant also asserts that fundamental error resulted from the given instructions' omission of the element of unlawfulness. *See generally* § 30-9-11(A) ("Criminal sexual penetration is the *unlawful* and intentional causing of a person to engage in . . . fellatio[.]" (emphasis added)). That assertion lacks merit. Use Note 1 to UJI 14-132 NMRA, the uniform instruction on the unlawfulness element, provides that the district court is to instruct the jury on unlawfulness only when "an issue is raised as to the lawfulness of the defendant's act." There was no issue here. In reaching its verdict, the jury found beyond a reasonable doubt that Defendant had performed fellatio on his underage son. None of the evidence tended to show any circumstance under which Defendant's actions could have been lawful, and we cannot imagine any such circumstance. Omission of the unlawfulness element was not fundamental error because there was no suggestion that the charged sex acts, "if they occurred, were other than unlawful[.]" *State v. Orosco*, 1992-NMSC-006, ¶ 9, 113 N.M. 780, 833 P.2d 1146; *see Stevens*, 2014-NMSC-011, ¶ 46.

U.S. 196, 201 (1948) ("[I]t is certain that [the defendants] were not tried for or found guilty of [the charge under which the appellate court upheld their conviction]. It is as much a violation of due process to send an accused to prison following conviction of a charge on which he was never tried as it would be to convict him upon a charge that was never made."); *see, e.g.*, *Commonwealth v. Mills*, 764 N.E.2d 854, 864-65 (2002) (reversing a larceny conviction where the jury had been instructed on the elements of traditional larceny but the evidence at trial would have supported a conviction only on a theory of larceny by false pretenses).

{16}     The given instructions informed the jury that it could only find Defendant guilty under a "position of authority" theory, and the jury did so. This Court cannot retroactively alter the basis for that verdict, applying the evidence adduced under a "position of authority" theory at trial to a "sleeping victim" theory that Defendant was not tried on and the jury never considered. *See State v. Villa*, 2004-NMSC-031, ¶¶ 12-13, 136 N.M. 367, 98 P.3d 1017 ("[G]iving [the d]efendant notice of the lesser-included offenses *after conviction* hardly provides [the d]efendant with adequate notice of those charges. . . . [And e]ven if we were to conclude that [the d]efendant had adequate notice of lesser-included offenses, we would still face the problem of convicting [the d]efendant on appeal of a charge he did not in fact defend at trial."); *State v. Loveless*, 1935-NMSC-023, 39 N.M. 142, 42 P.2d 211; *cf. State v. McGee*, 2002-NMCA-090, ¶ 18, 132 N.M. 537, 51 P.3d 1191 ("Adequate notice of charges is a principle precious to any system of ordered liberty which we will not dilute with a harmless error review."); *State v. Armijo*, 1977-NMCA-070, ¶ 24, 90 N.M. 614, 566 P.2d 1152 (rejecting as "no more than speculation" the state's argument "that the defense would not have been different if the defen[dant] had been given notice"). The State chose to put Defendant on trial for a crime that did not exist when Defendant was alleged to have committed it. Now, it is bound by the consequences of that choice: remand and, as discussed below, a new trial. *Cf. Villa*, 2004-NMSC-031, ¶ 14 ("[Both the state and the defense] should be liable for the risks of their respective trial strategies.").

## II.     Double Jeopardy Does Not Bar Retrial

{17}     Because Defendant's convictions must be reversed, we next determine whether the State may retry Defendant for CSPM-II. Retrial is not barred if sufficient evidence was introduced at trial to support a conviction under the erroneous given instructions. *State v. Luna*, 2018-NMCA-025, ¶ 27, ___ P.3d ___, *cert. denied*, 2018-NMCERT-___ (No. S-1-SC-36896, Mar. 16, 2018); *State v. Rosaire*, 1996-NMCA-115, ¶ 20, 123 N.M. 250, 939 P.2d 597. "[T]he test to determine the sufficiency of the evidence . . . is whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Sutphin*, 1988-NMSC-031, ¶ 21, 107 N.M. 126, 753 P.2d 1314. "[W]e must view the evidence in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *State v. Holt*, 2016-NMSC-011, ¶ 20, 368 P.3d 409 (internal quotation marks and citation omitted).

**{18}**    There was substantial evidence of Defendant's guilt under the given instructions. G.F. testified that Defendant had put "his mouth [on G.F.'s] penis" within both relevant timeframes, during which G.F. was thirteen or fourteen years old. The evidence established that Defendant was G.F.'s father, placing him in a position of authority over G.F. as a matter of law.[4] *See* § 30-9-10(E). From G.F.'s testimony, the jury could reasonably have concluded (as the State posited) that G.F. had been coerced into lying still while Defendant perpetrated the fellatio, a symptom of the undue influence that Defendant's position as G.F.'s father enabled him to exercise. Further, coercion in the "position of authority" context "can be inferred [from] a child's reluctance or fear to report the sexual [abuse]." *Arvizo*, 2018-NMSC-026, ¶ 21. At trial, G.F. indicated that he had initially been reluctant to disclose what Defendant had done to him because he did not know how people would react and worried that people would "think about [him] differently" if he disclosed the abuse. Based on this evidence, a reasonable jury could have found that Defendant used his position of authority to coerce G.F. to submit to fellatio on both charged occasions. Double jeopardy thus does not bar Defendant's retrial.

### III.    The District Court Correctly Calculated Presentence Confinement Credit

**{19}**    Finally, we address Defendant's argument that he is entitled to additional days of credit for time spent on conditions of pretrial release prior to his conviction. Defendant was arrested and taken into custody on the charges at issue on May 7, 2015. He was released into his wife's custody and placed on house arrest on May 29, 2015, on conditions of release that required him to wear an ankle monitor and enroll in an electronic monitoring program (EMP). On September 18, 2015, the district court entered an order freeing Defendant from house arrest and leaving Defendant on conditions of release that required him:

> not to possess firearms or dangerous weapons;
>
> not to possess or consume alcohol or enter liquor establishments;
>
> not to possess or use any narcotic drugs without a valid prescription[;]
>
> not to violate any federal, state[,] or local criminal law;
>
> to notify the court of any change of address;

---

4 While Defendant's status as G.F.'s father should technically be irrelevant to our analysis because of the language of the erroneous instruction, neither party disputes that Defendant occupied a position that enabled him to exercise undue influence over G.F., and an abundance of evidence would have allowed the jury to reach that conclusion. We are satisfied that none of the "rare circumstances in which a parent . . . is not able to exercise authority over [his or her] child," *State v. Erwin*, 2016-NMCA-032, ¶ 9, 367 P.3d 905, are present here, and we therefore find it unnecessary to discuss evidence pertinent to other positions of authority that the jury may have found Defendant occupied.

not to leave . . . [the] State of New Mexico without prior permission of the [c]ourt;

to maintain contact with [his] attorney;

to avoid all contact with the alleged victim or anyone who [might] testify in [the] case;

[to] submit to random UA (urine test[s]) or breathalyzer test[s], [as well as those] by any law enforcement personnel with reasonable suspicion[; and]

no[t to] driv[e] a motor vehicle without a valid driver[']s license and valid insurance.

The conditions further required Defendant to continue wearing an ankle monitor and prohibited him from having "unsupervised contact with children under the age of [eighteen] except [for] his own."

**{20}** On December 4, 2015, the district court again modified Defendant's conditions of release, adding two further conditions: (1) a curfew between the hours of 10 p.m. and 7 a.m. and (2) an order prohibiting Defendant from going onto the grounds of G.F.'s former school. Defendant remained on release subject to these conditions until he was convicted and remanded into custody on December 14, 2016.

**{21}** Prior to sentencing, Defendant and the State submitted briefs with differing calculations of presentence confinement credit. Defendant asserted that he was entitled to credit for 663 days, the entire time between his initial arrest and the date of his conviction. The State, on the other hand, asserted that Defendant was entitled to credit for only 205 days, reflecting the time Defendant had spent incarcerated and, in accordance with *State v. Guillen*, 2001-NMCA-079, ¶ 10, 130 N.M. 803, 32 P.3d 812, and *State v. Duhon*, 2005-NMCA-120, 138 N.M. 466, 122 P.3d 50, on house arrest. The district court entered a judgment and sentence on April 14, 2017, that credited Defendant with 205 days of presentence confinement and additional time spent incarcerated prior to sentencing.

**{22}** Defendant asserts that the district court erred by failing to give him credit for (1) the entire time following his release from house arrest on September 18, 2015, until his conviction; or (2) the time between the district court's December 4, 2015, modification of Defendant's conditions and his conviction. We disagree. Because we conclude that the more onerous conditions of the December 4, 2015, order are insufficiently restrictive to qualify for credit, we do not separately address Defendant's claim that credit should apply from September 18, 2015.

**{23}** NMSA 1978, Section 31-20-12 (1977) provides that "[a] person held in official confinement on suspicion or charges of the commission of a felony shall, upon conviction of that or a lesser included offense, be given credit for the period spent in

presentence confinement against any sentence finally imposed for that offense." *See generally State v. Ramzy*, 1982-NMCA-113, ¶ 8, 98 N.M. 436, 649 P.2d 504 ("The language of the statute is mandatory."). Because we must interpret Section 31-20-12 to determine whether Defendant qualifies for presentence confinement credit, our review of the district court's calculation of credit is de novo. *State v. Romero*, 2002-NMCA-106, ¶ 6, 132 N.M. 745, 55 P.3d 441.

**{24}** In interpreting Section 31-20-12, we aim to provide "a clear guide that does not require fact intensive inquiries into whether specific conditions of release subject a defendant to jail-type confinement[,]" *Guillen*, 2001-NMCA-079, ¶ 6, without "foreclos[ing] the exercise of reasonable flexibility by sentencing courts through the adoption of too bright a line." *State v. Fellhauer*, 1997-NMCA-064, ¶ 16, 123 N.M. 476, 943 P.2d 123. We determine whether Defendant was "held in official confinement" by applying the two-pronged *Fellhauer* test:

> Section 31-20-12 applies to time spent outside a jail, prison or other adult or juvenile correctional facility when (1) a court has entered an order releasing the defendant from a facility but has imposed limitations on the defendant's freedom of movement, OR the defendant is in the actual or constructive custody of state or local law enforcement or correctional officers; and (2) the defendant is punishable for a crime of escape if there is an unauthorized departure from the place of confinement or other non-compliance with the court's order.

*Fellhauer*, 1997-NMCA-064, ¶ 17.

**{25}** Defendant asserts, and the State does not dispute, that the second prong of *Fellhauer* was met because Defendant would have been subject to a charge of escape under NMSA 1978, Section 30-22-8.1 (1999), had he violated his conditions of release.[5] So the only issue before us is whether Defendant was subject to "limitations on [his] freedom of movement" within the meaning of the first prong. We agree with the State that Defendant's pretrial release did not satisfy that prong because the conditions of his release were "[in]sufficiently restrictive." *Guillen*, 2001-NMCA-079, ¶ 7.

**{26}** Defendant relies on *Guillen* and the decision of the Court of Appeals of Maryland in *Dedo v. State*, 680 A.2d 464 (Md. 1996), to support his contention that the conditions of his release following the December 4, 2015, modification were sufficiently restrictive to qualify for credit. In *Guillen*, we noted that *Fellhauer* had approvingly cited *Dedo* and observed that it "appears that the defendant in *Dedo* was not under total house arrest,

---

[5] Section 30-22-8.1, enacted after *Fellhauer* was decided, criminalizes escape from "community custody release programs," including EMPs and "community tracking program[s.]" *See generally Duhon*, 2005-NMCA-120, ¶¶ 6-13 (holding that the "escape charge" prong of the *Fellhauer* test had been satisfied because the defendant was subject to prosecution for escape under Section 30-22-8.1 while on house arrest pursuant to an EMP); *State v. Martinez*, 1998-NMCA-047, ¶ 8, 125 N.M. 83, 957 P.2d 68.

but was subject to a curfew."[6] *Guillen*, 2001-NMCA-079, ¶ 10 (citing *Dedo*, 680 A.2d at 469-70). Defendant seizes on this observation and asserts he is entitled to credit because the conditions of his release were "substantially the same" as the conditions at issue in *Dedo*. We disagree. *Dedo* is, of course, not binding on this Court. Moreover, rather than supporting Defendant's proposed holding, *Guillen* indicates that time spent subject to a curfew is not "official confinement" under our statute, regardless of participation in an EMP program. 2001-NMCA-079, ¶ 9.

**{27}** The defendant in *Guillen* had been released from jail subject to conditions that required him to participate in an EMP and to "remain at his home at all times except to attend alcohol counseling, work, or religious services." *Id.* ¶ 2 (internal quotation marks omitted). On appeal, we framed the issue before us as "whether the . . . conditions of release were sufficiently restrictive" to satisfy the first prong of *Fellhauer*. *Guillen*, 2001-NMCA-079, ¶ 7. Answering this question in the affirmative, we relied on our statement in *Fellhauer* that a "release order modeled after [the forms found in] Rules 9-302 [NMRA] and 9-303 [NMRA at the time] would normally not be sufficient to earn the credit." *Guillen*, 2001-NMCA-079, ¶ 9 (quoting *Fellhauer*, 1997-NMCA-064, ¶ 18). Because one of the standard conditions in those forms was a condition requiring a defendant "not to leave [the defendant's] residence between the hours of _____ (p.m.) and _____ (a.m.) without prior permission of the court[,]" we concluded "that a curfew, without more, is an insufficient restriction on movement to entitle a defendant to presentence credit."[7] *Id.* ¶ 9. We reasoned, however, that "house arrest is substantially more onerous than a curfew[,]" noting that the defendant had not been "allowed to leave home except for specified events" and that the defendant's compliance with his conditions of release had been continuously monitored by corrections officers. *Id.* We therefore held:

> that any defendant charged with a felony who is released (1) under
> conditions of house arrest that require the defendant to remain at home
> except to attend specified events such as treatment, work, or school and
> (2) pursuant to a community custody release program that holds the
> defendant liable to a charge of escape under Section 30-22-8.1, is entitled
> to presentence confinement credit for the time spent in the program.

*Id.* ¶ 11.

**{28}** Defendant contends that when "the freedom of movement of a presumptively innocent citizen is limited or curtailed in any way, upon threat of incarceration in the

---

6 "[A]ppears" was an apt word choice. Although *Dedo* twice references a provision in the defendant's home detention contract stating that "any unexcused or unexplained absence during curfew hours [would] be considered an escape[,]" the opinion never makes clear what those hours were and repeatedly refers to the defendant's "home detention." *Dedo*, 680 A.2d at 466 (brackets and internal quotation marks omitted). *Fellhauer* itself nowhere mentions the curfew provision, alluding instead to the defendant's "home detention" in its discussion of *Dedo*. 1997-NMCA-064, ¶¶ 12-13.
7 Although Rules 9-302 and 9-303 have been amended since our decisions in *Fellhauer* and *Guillen*—most notably in 2017, when amendments "completely rewrote [both] form[s,]" as their annotations note—Rule 9-303 still contains a virtually identical curfew provision.

event of violation of terms or conditions, that should be sufficient to require credit for time served in an electronic monitoring or community custody program." But that contention cannot be reconciled with the reasoning of either *Guillen* or *Fellhauer* itself.

**{29}** When we decided *Fellhauer*, it was unclear whether *house arrest* could ever qualify for presentence confinement credit. 1997-NMCA-064, ¶ 2. The defendant there challenged the district court's denial of credit for time he had spent under house arrest on conditions of release that required him to stay at home except for medical treatment and attorney visits, and his appeal thus squarely raised that issue. *Id.* After concluding that there was no plain meaning of "official confinement" that determined whether house arrest would qualify, we turned to the text of similar statutes and our case law interpreting Section 31-20-12, neither of which provided "specific guidance" regarding the "extent" or "type of limitation of freedom necessary to find confinement outside a place of incarceration." *Fellhauer*, 1997-NMCA-064, ¶¶ 6-7. Moving on to the statute's purpose, we noted that Section 31-20-12 was intended "to give some relief to persons who, because of an inability to obtain bail, are held in custody." *Fellhauer*, 1997-NMCA-064, ¶ 8 (quoting *State v. Howard*, 1989-NMCA-029, ¶ 11, 108 N.M. 560, 775 P.2d 762). We found that purpose "of little value" to our analysis, however, because the defendant was not "in jail" while on house arrest, and granting credit would thus have advanced Section 31-20-12's purpose "only to the extent that the lack of bail resulted in significantly more onerous conditions of release." *Fellhauer*, 1997-NMCA-064, ¶ 8. And that, we reasoned, was the "basic question" raised by the defendant's appeal: "whether the conditions placed on [the d]efendant when he was . . . on house arrest were sufficiently onerous to be deemed official confinement." *Id.* To answer that question, we drew heavily on out-of-state cases analyzing comparable statutes. *See id.* ¶¶ 9-17. We noted that most out-of-state cases had "contrast[ed] the conditions encountered by [a d]efendant in jail with the normal experience of house arrest or home detention and conclude[d] that the latter is simply not restrictive enough to qualify for credit." *Id.* ¶ 11. On the other hand, those cases that had reached a contrary decision had "undertake[n] essentially the same analysis but . . . conclude[d] that . . . the conditions imposed were sufficiently onerous to earn the credit." *Id.* ¶ 12. We found the latter category of cases persuasive in reaching our holding. *See id.* ¶¶ 13, 17.

**{30}** As its reasoning makes clear, *Fellhauer* based its formulation of its namesake test on an assessment of when conditions of release become so restrictive as to subject a defendant to conditions *approaching those experienced by people who are incarcerated*. Its first prong thus asks a similar question, rather than asking whether a defendant has been subjected to a restriction on movement in the abstract sense as Defendant contends.

**{31}** Viewed through that lens, the conditions of Defendant's release were an insufficient limitation on his freedom of movement for him to qualify for credit under *Fellhauer*. Defendant was free to move throughout the state during non-curfew hours, answerable to no one for his whereabouts during that time; as long as he stayed away from G.F.'s former school and returned to his residence by 10 p.m., he could go wherever he liked. Defendant did not have to ask the court or the staff of the EMP

program for permission to leave his home. Nor was his freedom of movement subject to the availability of a third-party custodian whose constant supervision was a condition of Defendant's release. *Cf. State v. Frost*, 2003-NMCA-002, ¶ 3, 133 N.M. 45, 60 P.3d 492 (stating that the defendant had been released on conditions that required him to "reside with his daughter . . . and be supervised by either of his two daughters at all times"). And he was not restricted to specific activities or events when he did leave. *Cf. Guillen*, 2001-NMCA-079, ¶ 9 ("[T]he defendant[ was] not allowed to leave home except for specified events[, and his] compliance with the conditions of release [was] monitored by correctional officers through [an EMP]."). While the condition that he remain in New Mexico and avoid one location within the state may have been burdensome, such a condition is simply not restrictive enough to qualify for credit. Confinement to the State of New Mexico is hardly comparable to the severe curtailment of liberty experienced by people who are incarcerated.

**{32}**  Defendant argues that the conditions requiring him to avoid unsupervised contact with minors and to submit to random urinalysis weigh in favor of an award of credit. We disagree. Defendant's first argument is based on his assertion that the no-unsupervised-contact condition was "a significant imposition" because he "owned a small business and pastored a church." Were we to assess Defendant's conditions of release in light of his activities as a business owner and pastor, we would be engaging in precisely the kind of "fact intensive inquir[y] into whether specific conditions of release subject a defendant to jail-type confinement" that we have previously counseled against. *Guillen*, 2001-NMCA-079, ¶ 6. Moreover, we do not believe that a roving ban on contact with a class of or specific individuals of this kind is a "limitation[] on the defendant's freedom of movement." *Fellhauer*, 1997-NMCA-064, ¶ 17; *cf. id.* (announcing the inquiry under the second prong, in relevant part, as whether the defendant is "punishable for a crime of escape for unauthorized departure from *the place of confinement*" (emphasis added)). As to Defendant's second argument, we fail to see how the random urinalysis condition restricted Defendant's freedom of movement even in combination with the other conditions of release. The condition required only that Defendant "submit to random [urinalysis] . . . [or urinalysis] by any law enforcement personnel with reasonable suspicion." Defendant does not argue or cite any record evidence that suggests that the condition was applied in such a way that it constrained his movements. This Court is under no obligation to review an unsupported or undeveloped argument, *see Headley v. Morgan Mgmt. Corp.*, 2005-NMCA-045, ¶ 15, 137 N.M. 339, 110 P.3d 1076, and we decline to do so here.

**{33}**  We hold that a conventional curfew,[8] even when combined with other, de minimis restrictions on a defendant's freedom of movement like a statewide travel condition,[9] is insufficiently onerous to constitute a limitation on movement under the first *Fellhauer*

---

8 By "conventional," we mean a curfew as it is normally understood—a requirement that the defendant stay within his residence or other place of confinement within reasonable specified hours, usually at night.
9 We do not imply that a statewide travel restriction is a de minimis imposition on a defendant's freedom of movement outside of the narrow context we are faced with here. Our task is to determine when limitations on movement are sufficiently restrictive to come within the ambit of Section 31-20-12, an issue entirely unrelated to the question of whether a district court should impose a statewide or similar travel restriction in the first place.

prong. The district court thus correctly determined that Defendant was not entitled to credit for the time that he spent on conditions of release between September 18, 2015, and December 15, 2016.

**CONCLUSION**

**{34}** We reverse Defendant's convictions and remand for a new trial. We affirm the district court's order regarding credit for time spent on pretrial release.

**{35}  IT IS SO ORDERED.**

**ZACHARY A. IVES, Judge**

**WE CONCUR:**

**LINDA M. VANZI, Judge**

**JULIE J. VARGAS, Judge**